## COMMISSIONER OF INTERNAL REVENUE v. NORFOLK SOUTHERN R. CO.

### No. 3274.

Circuit Court of Appeals, Fourth Circuit.
Jan. 31, 1933.

J. Louis Monarch, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Morton K. Rothschild, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and L. A. Norman, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for petitioner.

W. B. Rodman, of Norfolk, Va., and Hugh C. Bickford, of Washington, D. C. (C. M. Bain, of Norfolk, Va., and R. Kemp Slaughter, of Washington, D. C., on the brief), for respondent.

Before PARKER and NORTHCOTT, Circuit Judges, and CHESNUT, District Judge.

CHESNUT, District Judge.

This case is here upon the petition of the Commissioner of Internal Revenue to review a decision of the United States Board of Tax Appeals relating to the income tax of the respondent, the Norfolk Southern Railroad Company, a Virginia corporation, for the tax year 1920. 22 B. T. A. 302.

Two items of alleged income are presented for determination. One may be briefly disposed of. During 1920 the railroad purchased and retired some of its own bonds for a sum less than the par value thereof. The Commissioner determined that the difference in amount was taxable income. The Board held that the Commissioner was wrong. But shortly thereafter the Supreme Court decided in a similar case that the difference in price did constitute taxable income. United States v. Kirby Lumber Co., 284 U. S. 1, 52 S. Ct. 4, 76 L. Ed. 131. The only differences between that case and the present are that in the Kirby Case the bonds were sold at par and were both issued and retired in the same year, while in the present case the bonds were issued at a discount, and all were issued prior to March 1, 1913, save one issued in 1914. These differences are not deemed material by the Board, which in later cases, including one relating to the purchase of its bonds by this same taxpayer (25 B. T. A. 925), has applied the principle of the Kirby Case, thus overruling its former decision to the contrary. Counsel for the parties have agreed that the proper basis in this case (as determined in these later decisions of the Board) for determination of the amount of the profit or income is the amount received for the bonds when issued, plus the amount of amortized discount (previously deducted from the taxpayer's income) on the one bond issued after March 1, 1913, less the cost of acquisition in 1920; and it is further agreed that the amount so determined is $20,241.99. As counsel for the railroad concedes that the decision of the Board with respect to this item must be reversed, it is not necessary to discuss the principle involved.

The remaining item in dispute involves a credit for "undermaintenance" allowed in settlement in 1922 to the railroad by the Director General of Railroads in the amount of $464,689.37. In the railroad's income tax return for 1920, it deducted from its gross income the sum of $2,741,737.06 actually expended by it for maintenance during 1920. The Commissioner reduced this amount by the amount of the allowance or credit made by the Director General in 1922, thus increasing the taxpayer's net income by the same amount. The Board reversed the Commissioner as to this item, and the question here is whether it was right in doing so.

Although the case was tried before the Board wholly on the quesiton whether the particular amount was a proper *deduction* from gross income, counsel for the Commissioner now contends here that the item must be *added* to gross income in the tax accounting, and abandons the theory advanced by the Commissioner. Mathematically it is obvious that the result as affecting the tax to be paid is the same, but equally clearly the legal question is not precisely the same. Counsel for the taxpayer contend that a new question is here presented for the first time not raised by the assignments of error. But we find it unnecessary to consider this procedural point because we have reached the conclusion that the item in dispute is not taxable as a part of the gross income for the year in question.

The controlling facts with regard to the allowance of this credit for "undermaintenance" are these: As is well known, the government under statutory authority took over the operation and management of the railroads of the country, including that of the Norfolk Southern Railroad Company, during the war, effective as of December 28, 1917. The period of federal control lasted until March 1, 1920 when the railroads were returned to private management, pursuant to section 200 of the Transportation Act, (chapter 91, 41 Stat. 457). Under the Federal Control Act (chapter 25, 40 Stat. 451), the President was authorized to agree with the carrier that during the period of such federal control it should receive just compensation; and that the agreement should contain adequate and appropriate provision for the maintenance, repair, renewals, and depreciation of the property, so that at the end of federal control the property of the carrier should be returned to it in substantially as good repair as it was at the beginning of federal control. On December 29, 1919, the Director General of Railroads, pursuant to the act of Congress referred to, made an agreement with the Norfolk Southern Railroad which, among other things, provided what annual compensation was to be paid by the government to the railroad, and also provided that during the period of federal control the Director General should *annually*, as nearly as practicable, expend either in payments for labor and materials or by payments into funds, such sums for the maintenance, repair, renewals, retirement, and depreciation of the property as would be requisite in order that the property might be returned at the end of federal control in substantially as good repair as it was on January 1, 1918. The standard to be applied to determine the amounts so required for maintenance and repair was to be the average *annual* expenditure and charges for such purposes included under the account rules of the Interstate Commerce Commission in railway operating expenses during the "test period" between July 1, 1914, and June 30, 1917; with due allowance for difference in cost of labor and materials. Expenditures made by the Director General during federal control for additions and betterments were to be charged to the railroad. A final accounting at the end of the federal control was provided for, and also an *annual* accounting if requested by either party. Apparently no annual accounting affecting the item now in dispute was had; but the final accounting was made in an agreement dated November 4, 1922, as provided for in the Federal Control Act and also directed by the Transportation Act, ch. 91, § 202, 41 Stat. 456, 459 (49 USCA § 72), and resulted in the allowance by the Director General of the sum of $464,689.37 on account of the railroad's larger claim for "undermaintenance" in the amount of $847,482.56. The amount so allowed was not paid in cash, because it was more than offset by a charge to the railroad made by the Director General on account of additions and betterments in the amount of $473,070.30.

In reducing the operating expenses of the railroad for 1920 (as deducted by it from gross income) by this sum of $464,689.37, the Commissioner stated: "Since it is impracticable to determine to what extent this deferred maintenance was made good during the year 1920, and since you cannot designate the years in which rehabilitation was performed, it seems reasonable to presume that the property was put in proper condition immediately on the return thereof from Federal control."

■ On appeal to the Board, the taxpayer challenged this theoretical presumption of fact, and on substantial, if not indeed uncontradicted, evidence the Board found, in substance, that on the return of the railroad to private management there was a condition of under or deferred maintenance which had accrued during federal control, that the railroad during the remainder of the year 1920 expended for maintenance (after making allowances for increased cost of labor and materials) sums sufficient only for normal or current maintenance, and that the deferred

maintenance existing at the end of the year was not less than on March 1, 1920. Thereupon the Board held that on the facts there was no basis for the presumption indulged by the Commissioner. The principle thus applied is consistent with the conclusions reached in Tunnel R. R. of St. Louis v. Commissioner Internal Revenue, 61 F.(2d) 166, 170 (C. C. A. 8) in a somewhat similar case dealing with this subject of railroad undermaintenance during the period of federal control. And as the finding of the Board was based on at least substantial evidence, we are not at liberty to disturb it, even if disposed to disagree, as we are not (Phillips v. Commissioner, 283 U. S. 589, 599, 51 S. Ct. 608, 75 L. Ed. 1289); and indeed we are not asked by counsel for the Commissioner to do so directly.

But while counsel for the Commissioner no longer insists on the theory adopted by the Commissioner, yet the same result, in effect, is still contended for on the theory that the allowance of the item in question to the taxpayer by the Director General of Railroads in 1922, constituted a part of the *gross income* of the taxpayer for that year. And it is now said that support for this theory is found in the cases of Burnet v. Sanford & Brooks Co., 282 U. S. 359, 51 S. Ct. 150, 75 L. Ed. 383; and Continental Tie & Lumber Co. v. United States, 286 U. S. 290, 52 S. Ct. 529, 76 L. Ed. 1111.

But in our opinion, this view of those cases is not sound. In Burnet v. Sanford & Brooks Co., the Supreme Court was dealing with a sum received by a contractor in a particular year, as a result of litigation, to recompense it for a loss sustained in an earlier year. The amount so received was held income for the year in which received on the principle that the whole business was a continuing one engaged in for profit; and the distinction was clearly made between ordinary income from the business and the depletion of capital used in the business. The court, by Mr. Justice Stone, there said at page 363 of 282 U. S., 51 S. Ct. 150, 151: "That the recovery made by respondent in 1920 was gross income for that year within the meaning of these sections cannot, we think, be doubted. The money received was derived from a contract entered into in the course of respondent's business operations for profit. While it equalled, and in a loose sense was a return of, expenditures made in performing the contract, still, as the Board of Tax Appeals found, the expenditures were made in defraying the expenses incur-

red in the prosecution of the work under the contract, for the purpose of earning profits. *They were not capital investments, the cost of which, if converted, must first be restored from the proceeds before there is a capital gain taxable as income."* (Italics supplied.)

The exact question there was, as here it must be, determined by the construction and application of the taxing statute then in force, which is the Revenue Act of 1918, ch. 18, 40 Stat. 1057, § 213, reading as follows:

"That for the purpose of this title * * * the term 'gross income'—

"(a) Includes gains, profits, and income derived from * * * dealings in property."

■ We think the true nature of the allowance made to the taxpayer for "undermaintenance" was a reserve for deferred maintenance, due to waste or impairment of capital; and was not a gain, profit, or income from property in any proper sense, either legal or economic. The proper analogy here is not that of the profit and loss account of a contracting business, but more nearly that springing from the well-known relationship of landlord and tenant, where the tenant agrees to keep the property in repair. In such a case a cash sum recovered from the tenant to measure the extent of the breach of his promise to repair is a restoration of capital and not income. Certainly this is true in the economic sense, and the income tax law treats it no differently. Eisner v. Macomber, 252 U. S. 189, 207, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570.

Nor does Continental Tie & Lumber Co. v. United States, supra, support the Commissioner's present contention. The item of money there received by the railroad and held to be taxable income was of quite a different nature from the undermaintenance allowance in this case. There the payment to the short line carrier (not under federal control) under section 204 of the Transportation Act (49 USCA § 73) was to partially reimburse it for a deficit in its railway operating income due to government operations of connecting or competing roads during federal control. The contention of the taxpayer, rejected by the court, was that the payments were in the nature of a subsidy or bonus, and therefore not taxable.

It is insisted by counsel for the Commissioner that, unless the allowance in question is held to be taxable income for 1920, it will escape taxation altogether. But this begs

the question as to whether it is really income at all. The proper treatment by the Commissioner of the item under consideration is to see that the taxpayer is not allowed credit in tax years subsequent to 1920 for maintenance expenses more than normal, whereby the railroad's property is rehabilitated from the condition of deferred maintenance existing at the time of the relinquishment of federal control.

For the reasons given, the order of the Board of Tax Appeals must be affirmed in part, and reversed in part.