SOUTHERN RY. CO. v. COMMISSIONER OF INTERNAL REVENUE (three cases).

HELVERING, Commissioner of Internal Revenue, v. SOUTHERN RY. CO.

Nos. 3707–3710.

Circuit Court of Appeals, Fourth Circuit.

Jan. 8, 1935.

W. T. Joyner and Sidney S. Alderman, both of Washington, D. C. (S. R. Prince, of Washington, D. C., on the brief), for Southern Ry. Co. and affiliated corporations.

Morton K. Rothschild, Sp. Asst. to the Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and J. Louis Monarch, Sp. Asst. to the Atty. Gen., on the brief), for Commissioner of Internal Revenue.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

These are petitions to review decisions of the Board of Tax Appeals relating to tax assessments against the Southern Railway Company and its affiliated corporations for the years 1920, 1921, and 1922. The principal questions involved relate to the treatment of allowances made the railway company and its affiliates by the Director General of Railroads on account of under-

maintenance and as additional compensation for the use of property during the period of federal control and for rental interest on completed additions and betterments made during that period. There is another and independent question relating to the right of one of the affiliates to deduct amortized bond discount for the years 1920, 1921, and 1922 on bonds sold at a discount and subsequently purchased by the company.

After the termination of federal control, negotiations looking to a settlement of the liability of the government were entered into between the Director General of Railroads and the company and its affiliates which were claiming $34,738,230.80 for undermaintenance and $10,338,031.10 for additional compensation. A lump sum settlement was agreed upon, as a result of which the company and its affiliates received $19,-427,485.90 in money and credits, all of which was allocated by the company and its affiliates to undermaintenance. The Director General, without the knowledge of the company, allocated on his books only $11,966,-199.35 to undermaintenance; but the Commissioner concedes that additional items of $280,000 and $559,734.33 should be allocated to this item, making the total undermaintenance allowance $12,805,933.68. The Director General allotted $4,836,764.58 as additional compensation generally and $244,800.38 as additional compensation on account of computation of mail pay, making the total of additional compensation in controversy $5,081,564.96. The company contends that this also is undermaintenance, making the total of that item, according to the company's contention, $17,887,498.64.

The company in making its tax returns for the year 1920 deducted $55,556,415.21 expended for maintenance in the last ten months of that year. The Commissioner reduced this amount by the amount which the Director General had allowed for undermaintenance; and the Board affirmed this action, adding by consent an item of $280,000 to the undermaintenance item. The petition of the company questions this ruling of the board, and the question so raised is the principal matter here in controversy. The Commissioner found that the $5,081,564.96, to which we have referred above, was additional compensation and taxable as income of the years of the final settlements in which it was allowed. The Board affirmed the Commissioner in holding it to be additional compensation and taxable as income, but held that it should be taxed as income of the period of federal control. The contention of the company and its affiliates in their petition is that it is not income at all but a part of the allowance for undermaintenance. The Commissioner, on the other hand, files petition complaining because it is held income of the period of federal control and asking that it and another item of $1,213,333.35, which is admittedly an allowance for additional compensation, and an item of rental interest of $391,347.60, allowed on completed additions and betterments, be held taxable as income of the years when allowed. Another question is presented as to the right of one of the affiliates to deduct from income amortized bond discount on mortgage bonds held by the company.

The records before us are voluminous; but, after the elimination of immaterial matters and questions upon which the parties are agreed, the case narrows itself to four questions, viz.: (1) Should the deduction on account of the company's expenditures for maintenance during the last ten months of the year 1920 be decreased by the amount allowed for undermaintenance during the period of federal control? (2) Should the $5,081,564.96 which the Commissioner and the Board treated as additional compensation be held to be a part of the allowance for undermaintenance? (3) If not held to be undermaintenance, should this and the other items of additional compensation and rental interest on additions and betterments be taxed as income of the years when allowed, or as income of the period of federal control? And (4) Is amortized bond discount allowable as a deduction where the bonds are held by an affiliate and a consolidated return is filed?

## 1. The Undermaintenance Question.

The allowance for undermaintenance was made the company and its affiliates by the Director General of Railroads because of the obligation of the government to maintain the properties while under federal control in as good condition as when taken over by the government. The property was returned to them in a run-down condition as compared with its condition when taken over; and the allowance on account of undermaintenance was to compensate for the damage which had been done to it as a result of the failure of the government to maintain it properly. The allowance was supposed to be determined by a comparison of the expenditures for upkeep during

the period of federal control with those made during the test period of private operation; i. e., the period of three years preceding June 30, 1917. As we shall point out hereafter, we think that $12,805,933.68 was the portion of the allowance made to the company and its affiliates which is properly allocable to undermaintenance.

The road was turned back to the company and its affiliates on March 1, 1920, and was operated by them thereafter. During the remaining ten months of that year they expended for upkeep and maintenance the sum of $55,556,415.21, which they have deducted from income as a usual and necessary expense of the business. It is admitted that the worst conditions of undermaintenance existing on March 1, 1920, were repaired out of this expenditure; but it is also admitted, not only that the expenditure of the $55,556,415.21 was less than normal when compared with like expenditures of the test period, but also that the road was in a worse state of disrepair at the end of 1920 than it was on March 1st. With respect to this matter, the finding of the Board of Tax Appeals was as follows:

"The general physical condition of the federal controlled companies' ways and structures was not as good on December 31, 1920, as, on March 1, 1920; and in June, 1921, the said properties were still undermaintained as compared with the maintenance standard of the test period.

"With reference to maintenance of equipment, the general condition of passenger cars, with regard to the percentages thereof in bad order, slightly improved between March 1, 1920, and December 31, 1920, there having been 8.41 per cent and 8.21 per cent of Southern Railway System passenger cars in bad order on those dates, respectively. As to freight train cars, 2.90 per cent of all revenue cars on line at March 1, 1920, were in bad order, while at December 31, 1920, the percentage had grown to 4.71. With regard to locomotives, 16.61 per cent of Southern Railway System locomotives were out of service for repairs at March 1, 1920, while at December 31, 1920, the percentage had grown to 18.29 per cent. These figures, though including Southern Railway System lines, some of which lines are not involved in these proceedings, are representative of the condition of equipment on the railroads comprising petitioner, 78 per cent of the passenger cars, 76 per cent of the freight train cars, and 85 per cent of the locomotives

referred to above being owned by the Southern Railway Company alone.

"Locomotive repairs represent approximately 50 per cent of the money spent by petitioner in 1920 for maintenance of equipment, and the conditions in the locomotive repair department are representative of the freight train car repair department. Locomotive repairs are divided into two classes, known as 'Classified Repairs,' which consist of such repairs as serve to rehabilitate or replace the fundamental parts of a locomotive, and 'Running Repairs,' which consist of the minor repairs that come up purely in the operation of the locomotive and which do not restore or rehabilitate the condition of the locomotive to any material extent. During the test period, the Southern Railway Company expended for classified repairs 40.72 per cent of its entire expenditures for locomotive repairs, while in the last ten months of 1920 it expended only 27.25 per cent of its total locomotive repair expenditures for that class of repairs. Its expenditures for temporary or running repairs in the test period and in the last ten months of 1920 were 59.28 per cent and 72.15 per cent, respectively, of the total locomotive repair expenditures of these periods. * * *

"Making due allowances for differences (1) in the purchasing power of the dollar, (2) in amount of property maintained, and (3) in the use of property maintained, as between the test period and the last ten months of 1920, the expenditures of the federal controlled companies for maintenance of ways, structures, and equipment were less in the last ten months of 1920 than in an average ten months of the test period, by approximately $1,300,000."

■ The question on this branch of the case is whether the deduction from income of the amount expended for upkeep and maintenance during the last ten months of 1920 should be reduced by the amount allowed for undermaintenance. The theory of the government is that this allowance was made the company to reimburse it for the bad state of repair existing when the road was returned to it, and that, to the extent of the allowance, repairs thereafter made to remedy this condition were paid for by the government and not by the company. The complete answer to this, we think, is that, after the company had expended the $55,000,000 which it seeks to deduct from income, its road was in a worse state of repair than before the expenditure. The

disrepair existing at the end of government control had not only not been remedied, but had become worse. The expenditures which the company seeks to deduct, therefore, had not resulted in improving the condition of the property, but were necessary to maintain the level of the condition existing on March 1st while the property was being used in earning the income of the last ten months of 1920. It was an expense incurred in the earning of that income. The government, some time later, made the allowance for undermaintenance; but not only was this money not used in 1920 to raise the condition of undermaintenance existing on March 1st, but no money was used for that purpose in 1920.

The allowance for undermaintenance, as we said in the case of Commissioner v. Norfolk & Southern Ry. Co., 63 F.(2d) 304, 306, 307, was in the nature of a restoration of capital which had been consumed by the government during the period of federal control; and the income tax problem in connection therewith is to see that, if and when it is expended in restoring the condition of the property, such capital expenditures are not used as deductions under the guise of expenditures for maintenance, or, as it was expressed in the Norfolk & Southern Case, "to see that the taxpayer is not allowed credit in tax years subsequent to 1920 for maintenance expenses more than normal, whereby the railroad's property is rehabilitated from the condition of deferred maintenance existing at the time of the relinquishment of federal control." Here the maintenance expenses for 1920 were not more than normal, and the railroad's property was not rehabilitated to any extent whatever from the condition existing at the end of federal control. The board found that between the end of federal control and the year 1926 the company spent $23,771,325.54 for maintenance betterments, all of which was charged to capital account, and none of which was claimed as deduction in income tax returns. It is certainly more logical to allocate the amount allowed for undermaintenance to these expenditures than to the purely maintenance expenditures which did not raise the condition level of the property.

■ The position taken by the Board in this case, and followed by it in the Ann Arbor Case, 29 B. T. A. 331, that there must be an examination of the particular items of maintenance expenditures, and that deduction should be disallowed for repairs which were

necessary at the end of federal control and for which the undermaintenance allowance was made, ignores, we think, the whole theory of railroad accounting as recognized by the railroads themselves, by the Treasury Department, and by the Interstate Commerce Commission. It would be inconvenient, if not impractical, in railroad accounting to charge every item having a life of more than one year to capital account and allow depreciation on it as a deductible item of expense; and in a great business where thousands of similar replacement or repair items are involved nothing would be gained by such a system of accounting, since, on the law of averages, expenditures for such items during a given year would substantially balance the depreciation for that year. The proper accounting practice, therefore, is to allow normal expenditures for repairs and replacements as an expense of the business and not to allow depreciation on such items except to the extent that it may not be covered by expenditures for repairs and replacements. This was approved by the Circuit Court of Appeals of the Sixth Circuit in Nashville, C. & St. L. Ry. Co. v. U. S., 269 F. 351, 354, certiorari denied 255 U. S. 569, 41 S. Ct. 375, 65 L. Ed. 790. And see Lindheimer v. Illinois Bell Telephone Co., 292 U. S. 151, 167, 168, 54 S. Ct. 658, 78 L. Ed. 1182, where the relationship between depreciation and current maintenance is discussed. Expenditures for repairs and replacements, therefore, when no greater than necessary to maintain the property of the railroad at the normal level of maintenance, merely counterbalance depreciation and are deductible from income, just as depreciation is deductible, in that they represent a necessary expense in the earning of income. The fact that a given repair or replacement remedies a condition needing repair in a preceding year is immaterial; for the end of the period in which the repair is made will show other items which as the result of operation over the period are in need of repair or replacement, and which must be repaired or replaced in succeeding periods. So long as the expenditure for this purpose does not exceed that which is necessary to preserve the normal level of maintenance, it is properly treated as an ordinary and necessary expense of the operation of the business, and is deductible from income as such.

The expenditure of the $55,556,415.21 for maintenance in the year 1920 was necessary to maintain the March 1, 1920, level of maintenance of the property. None of

it can be treated as having been spent to restore the condition of the property from the undermaintenance existing on March 1st, because, as above stated, the condition of the property was not restored, but was worse at the end of 1920 than on March 1st. The fact that many of the repairs were of items needing repair on March 1st is immaterial, because these particular items are more than offset by the wear and tear on the property resulting from operation during the remainder of the year.

Before the Board decided this case, it had held in a number of cases that, where expenditures for maintenance did not exceed normal, they were not to be reduced by the allowance for undermaintenance, and that it was immaterial that some of the conditions of disrepair existing at the end of federal control may have been remedied by expenditures for maintenance made in the succeeding ten-month period. Missouri Pacific Railroad v. Commissioner, 22 B. T. A. 267; Norfolk Southern Railroad Co. v. Commissioner, 22 B. T. A. 302; Kansas City Southern Railway Co. v. Commissioner, 22 B. T. A. 949; Chicago & N. W. R. Co. v. Commissioner, 22 B. T. A. 1407. And see Terminal Railroad Association of St. Louis v. Commissioner, 17 B. T. A. 1135; International-Great Northern Railroad Co. v. Commissioner, 24 B. T. A. 726; and New York, Chicago & St. Louis Railroad Co. v. Commissioner, 26 B. T. A. 1229, where deduction of maintenance expenditures to the extent of the undermaintenance allowance was disapproved, because of lack of proof that the Director General's undermaintenance had not been made good or because the railroad had failed to prove that its expenditures did not exceed normal. In the Missouri Pacific Case the Board said: "Counsel for the Commissioner points out that their testimony discloses that many of the worst conditions existing when the roads were returned were corrected as soon as possible. While this was done, the testimony is that it was at the expense of less pressing items of current maintenance. Amounts available for maintenance were expended where most needed. Primary lines were improved while the secondary lines suffered still further undermaintenance. It is quite evident that the question can not be solved merely by looking at particular items of maintenance or undermaintenance. The real question is whether the average condition of maintenance was improved during 1920."

And in the Norfolk Southern Case the Board said: "That some small portions of the payments for maintenance during the taxable period may have reduced some item of physical undermaintenance that existed at the beginning thereof is not material. The credit in question was not allowed as payment for actual physical loss resulting from using up or destroying definitely identified and inventoried assets of the petitioner, but was an amount ascertained by comparing the costs of maintenance during the period of Federal control with the payments for such purpose during the test period. It is an accounting result representing impairment or destruction of a mass of capital property which is presumed to have occurred because as compared with the test period an insufficient amount was paid for maintenance. To ask the petitioner to show that no item of its tangible property that was in disrepair at March 1, 1920, was rehabilitated during the ten-month period under review is, in the circumstances here, to impose an impossible condition. The evidence shows that the total expended is a proper deduction from petitioner's gross income for the taxable period as a part of the ordinary and necessary expenses of the petitioner."

And in the Kansas City Southern Case the Board said: "We have held in Terminal Railroad Association of St. Louis v. Commissioner, supra, and in Norfolk Southern Railroad Co. v. Commissioner, 22 B. T. A. 302, that payments made by the Director General to railroads on account of undermaintenance are of a capital nature. We think it follows that after any such payment the amount thereof merged into the resources of the railroad and became available to it for any proper corporate purpose. If this position is sound there is no relation between the payment by the Director General for undermaintenance and the deductions which this petitioner is legally entitled to take from its gross income as operating expenses in the computation of its tax liability in 1920, unless the cost of replacement of capital property previously or in the future to be paid for is included in the amount claimed. The deductions from gross income on account of maintenance must stand or fall on proof as to whether they are within the statutory enumeration of items deductible from gross income in the computation of net taxable income."

The decision of the Board on this question had the approval of this court on petition to review its action in the Norfolk Southern Case. Commissioner v. Norfolk Southern R. Co. (C. C. A. 4th) 63 F.(2d) 304, certiorari denied Burnet v. Norfolk Southern R. Co., 290 U. S. 672, 54 S. Ct. 91, 78 L. Ed. 580. It is true that before this court counsel for the Commissioner virtually abandoned the position that the allowance for undermaintenance should be used to decrease deductions on account of maintenance in 1920, and urged that it should be taxed as income in that year; but nevertheless the court went fully into the nature of the undermaintenance allowance and held that, in circumstances such as we have here, it was not taxable as income, and should not be used to decrease the deduction on account of maintenance. The court, speaking through Judge Chesnut, said:

"The Board found, in substance, that on the return of the railroad to private management there was a condition of under or deferred maintenance which had accrued during federal control, that the railroad during the remainder of the year 1920 expended for maintenance (after making allowances for increased cost of labor and materials) sums sufficient only for normal or current maintenance, and that the deferred maintenance existing at the end of the year was not less than on March 1, 1920. Thereupon the Board held that on the facts there was no basis for the presumption indulged by the Commissioner. The principle thus applied is consistent with the conclusions reached in Tunnel R. R. of St. Louis v. Commissioner of Internal Revenue, 61 F.(2d) 166, 170 (C. C. A. 8) in a somewhat similar case dealing with this subject of railroad undermaintenance during the period of federal control. And as the finding of the Board was based on at least substantial evidence, we are not at liberty to disturb it, even if disposed to disagree, as we are not (Phillips v. Commissioner, 283 U. S. 589, 599, 51 S. Ct. 608, 75 L. Ed. 1289); and indeed we are not asked by counsel for the Commissioner to do so directly."

In Chicago & N. W. R. Co. v. Commissioner (C. C. A. 7th) 66 F.(2d) 61, certiorari denied Burnet v. Chicago & N. W. R. Co., 290 U. S. 672, 54 S. Ct. 90, 91, 78 L. Ed. 580, the Circuit Court of Appeals of the Seventh Circuit held that it was improper to decrease deductions for maintenance by the allowance for undermaintenance, even to the extent that the expenditures for maintenance exceeded normal. This decision supports the conclusion at which we have arrived, although it is not necessary here to decide whether such treatment of abnormal maintenance expenditures is correct, or whether, to the extent that they are abnormal, they should not be treated as a mere restoration of capital, as we indicated in the Norfolk Southern Case.

The case of New York, C. & St. L. R. Co. v. Helvering (App. D. C.) 71 F.(2d) 956, 960, upon which the Commissioner relies, while disagreeing with the Seventh Circuit as to the treatment of maintenance expenditures in excess of normal, approves the rule laid down by this court in the Norfolk Southern Case, to the effect that deductions for normal expenditures for maintenance are not to be decreased by reason of the allowance for undermaintenance. The court, in an able opinion by Judge Groner, points out that, to the extent that expenditures for maintenance are abnormal, they should be treated as expenditures in restoration of capital for which the railroad is reimbursed by the government, but that, to the extent that they do not exceed normal expenditures, they should be treated as deductible expense of the period of operation over which they were incurred. The court said:

"On the other hand, if the Lake Erie had shown that the money expended in the ten months' period of 1920 was only normal maintenance, the deduction of the full amount expended would have been permissible, and the payment would not have been taxable as income. In such case it would have been expending only its own funds and the payment from the Director General would have been held by the railroad company in the place and instead of its capital depreciation, and that is just what was decided in the Norfolk Southern Case, supra; but here, as we have said already several times, the railroad as found by the Board, spent not only the amount of money ordinarily required for its maintenance account, but in addition the money which it received from the Director General. As to the former, it was a deductible expense. As to the latter, it was money paid subject to a contract of reimbursement, and, so far as we know, such an outlay has never been considered to be deductible."

No ground of distinction exists between the case at bar and the Missouri Pacific and Norfolk Southern Cases by reason of

the stipulation of the company that during the last ten months of 1920 it repaired many of the worst conditions of undermaintenance existing on March 1st and charged the cost thereof to operating expenses. This was found as a fact in the Missouri Pacific, Norfolk Southern, and Kansas City Southern Cases; and certainly the taxpayer is in no worse condition from a stipulation than he is from a finding supported by evidence.

## 2. Was the $5,081,564.96 Additional Compensation?

As heretofore stated, the settlement between the company and its affiliates, on the one hand, and the Director General on the other, was a lump sum settlement. The company had presented a claim in the sum of $34,738,230.80 for undermaintenance and one for $10,338,031.10 for additional compensation, and in the course of negotiations the Director General had admitted that the company was entitled to some additional compensation; but no allocation as between the claims was made of the sum awarded in settlement. The company allocated no part of this to additional compensation, but treated it as restoration of capital upon which no payment of tax was required. The Director General upon his books allocated as additional compensation generally the sum of $4,836,764.58 and as additional compensation arising out of back mail pay the sum of $244,734.33. The Commissioner found both of these items to be additional compensation, and the Board affirmed this finding. The company contends that they should be allocated to undermaintenance on the theory that it has so allocated them, and that it had the right to apply them to its claims as it saw fit, in the absence of any application by the Director General.

The rule as to application of payments upon which the company relies is unquestionably correct in the case of ordinary transactions between debtor and creditor, where a question arises as to which claim has been extinguished by a payment. See Maryland Casualty Co. v. City of South Norfolk (C. C. A. 4th) 54 F.(2d) 1032, 1038. In this case, however, both claims have been extinguished, and the question is, not as to the extinguishment of claims in the hands of the creditor, but as to how the creditor shall be taxed on funds received in extinguishment of both claims. It is clear that the question as to how the fund should be apportioned between the claims for purposes of taxation is a question of fact, and that the Commissioner is not bound by the apportionment made by the taxpayer. His finding with regard thereto is not only evidence for the consideration of the Board and of this court, but is presumptively correct. The burden rested upon the taxpayer, therefore, to show that the Commissioner's determination with regard to the matter was wrong; and, in the absence of such showing, the Board properly affirmed the Commissioner's action. Wickwire v. Reinecke, 275 U. S. 101, 105, 48 S. Ct. 43, 72 L. Ed. 184; Lightsey v. Com'r (C. C. A. 4th) 63 F.(2d) 254; Anchor Co. v. Commissioner (C. C. A. 4th) 42 F.(2d) 99; Brooks v. Commissioner (C. C. A. 4th) 35 F.(2d) 178; Missouri Pacific R. Co. v. Commissioner, 22 B. T. A. 267, 291.

## 3. The Taxing of the Additional Compensation.

The Board held that the additional compensation awarded the company and its affiliates should be taxed as income of the period of federal control. The Commissioner contends that it should be taxed as income of the years in which the settlements awarding the compensation were arrived at. We think that the holding of the Board is correct. The matter has been gone into thoroughly by the Circuit Courts of Appeals of three Circuits and the Court of Appeals of the District of Columbia, and further discussion of the question is unnecessary. See Helvering v. Gulf, M. & N. R. Co. (App. D. C.) 71 F.(2d) 953, 954; Helvering v. St. Louis S. W. Ry. Co. (C. C. A. 8th) 66 F.(2d) 633; Commissioner v. Midland Valley R. Co. (C. C. A. 10th) 57 F.(2d) 1042; Commissioner v. Old Dominion Steamship Co. (C. C. A. 2d) 47 F.(2d) 148. We think also that the case is ruled by the decision of the Supreme Court in Continental Tie & Lumber Co. v. U. S., 286 U. S. 290, 52 S. Ct. 529, 531, 76 L. Ed. 1111. That case, it is true, dealt with additional compensation under the standard return as fixed by the Interstate Commerce Commission; but, so far as the question here involved is concerned, we think that there is no difference between the award of additional compensation under the standard return as fixed by the Commission and the award of additional compensation by the Director General. In either case the award is based upon data "obtained from the railway's books and accounts and from entries therein all made prior to March 1, 1920."

894

· The taxation of interest received on additions and betterments differs from the taxation of additional compensation only in the respect that the rate of interest to be allowed was not determined until final settlement. We do not think that this involves any difference in principle or requires different treatment. The road was entitled to reasonable compensation, and, when this was expressed in terms of interest, it meant a reasonable rate of interest based on the conditions prevailing in the money market, which were readily ascertainable. The decision of the Board is in accord with the decisions of the courts. Helvering v. G., M. & N. R. Co. (App. D. C.) 71 F.(2d) 953, 954; Helvering v. St. Louis S. W. Ry. Co. (C. C. A. 8th) 66 F.(2d) 633 (and see St. Louis Southwestern Ry. Co. v. Commissioner, 24 B. T. A. 917 at page 922). As said by the Court of Appeals of the District of Columbia in the Gulf, M. & N. Case: "From an income tax standpoint we are unable to see any difference between the compensation paid for the use of the property held and used throughout the federal control period and compensation for the use of property held and used during part of such period." The case of Kentucky & Indiana Terminal R. R. v. Commissioner (C. C. A. 6th) 54 F.(2d) 738, is not to the contrary, as the court held in that case that liability for interest was not determined until a controversy over bridge tolls was settled. Here there was no question as to the liability for rental interest for the additions and betterments.

### 4. The Question of Bond Discount.

■ The Mobile & Ohio Railroad, one of the affiliates of the Southern, sold its 4 per cent. bonds at a discount in 1888. In 1901 the Southern purchased most of these bonds from the holders thereof, delivering its own 4 per cent. bonds of equal par value in payment. The bonds of the Mobile & Ohio were pledged in trust to secure the payment of the bonds of the Southern so issued. During the years 1920, 1921, and 1922, the Southern and Mobile and Ohio were affiliated and filed consolidated returns. The contention of the company is that the Mobile & Ohio is entitled to deduct the amortized portion of the bond discount allocable to the years mentioned from its return of income for those years. This question, however, is definitely settled against the position of the company by the recent decisions of the Supreme Court in Old Mission Portland Cement Co. v.

Helvering, 293 U. S. 289, 55 S. Ct. 158, 160, 79 L. Ed. ——, and Gulf, M. & N. R. Co. v. Helvering, 293 U. S. 295, 55 S. Ct. 161, 79 L. Ed. ——.

The distinction is suggested that in the cases cited the bonds were acquired by a member of the affiliated group during the period of affiliation, whereas here the affiliation occurred at the same time as the acquisition of the bonds. We do not think, however, that this distinction is material. The Supreme Court in the cases cited based its disallowance of the deduction of amortized bond discount, not upon anything connected with the acquisition of the bonds, but upon the fact that such discount is deductible only by way of anticipation of payment of the bonds at maturity, and may not be deducted where the payment anticipated is from one affiliate to another, and is thus an intercompany transaction.

The court said:

"Amortized bond discount is deductible from the taxpayer's gross income only by way of anticipation of payment of the bonds at maturity. It is then that the taxpayer pays the difference, between the amount realized upon the sale of the bonds and their par value, which is the subject of the amortization. Helvering v. Union Pacific Railroad Co., supra [55 S. Ct. 165, 79 L. Ed. ——]. Here the payment anticipated is from one affiliate to another, an intercompany transaction. If we eliminate it from the computation of income upon the consolidated return, as the regulation directs, there is no anticipated payment of the discount to be amortized and no basis for the deduction.

"A single taxpayer who had purchased his own bonds before maturity could not afterwards deduct, from gross income, the amortized discount on the bonds, in anticipation of their payment at maturity. This is equally the case where the obligor and obligee are affiliated corporations claiming the benefit of a statute which permits them to compute their tax as though they were one. It is true that in either case the bondholder may sell his bonds before maturity, and thus renew his obligation to pay them. But in neither is the taxpayer in a position to require the government to anticipate an event which may never occur, by conferring upon him the benefit of a deduction to which, without its occurrence, he would not be entitled. Having elected to take the benefit of affiliation, the taxpayer cannot complain of a burden which is inseparable from the benefit and which

finds its source in the very method of computing the tax from which the benefit is derived."

For the reasons stated, it appears that the decision of the Board of Tax Appeals with respect to all the matters complained of was correct, except that the allowance for undermaintenance amounting to $12,805,933.68 (composed of items of $11,966,199.35 plus $280,000 plus $559,734.33, the last being the item referred to in the opinion of the Board as "profit on rail") should not be subtracted from the deductions on account of maintenance expenditures in the year 1920, nor should the so-called "profit on rail" of $559,734.33 be taxed as income. In case No. 3707, therefore, the decision of the Board is reversed in part, and the cause is remanded for further proceedings in accordance with this opinion. On the points raised by the appeals in Nos. 3708, 3709, and 3710, the action of the Board is affirmed.

No. 3707, reversed in part; affirmed in part and remanded.

No. 3708, affirmed.

No. 3709, affirmed.

No. 3710, affirmed.