## NEW YORK, C. & ST. L. R. R. CO. v. HELVERING, Commissioner of Internal Revenue (two cases).
### Nos. 6155, 6156.

Court of Appeals of the District of Columbia.
Argued May 11, 1934.
Decided June 4, 1934.

Claude W. Dudley, of Washington, D. C., for petitioners.

E. Barrett Prettyman, E. C. Algire, Sewall Key, J. Louis Monarch, Frank J. Wideman, and Erwin N. Griswold, all of Washington, D. C., for respondent.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

Petitioner is a railroad company formed in 1923 by the consolidation of five railroad companies, one of which was Lake Erie & Western Railroad Company, hereinafter referred to as Lake Erie. The case involves the tax liability of Lake Erie for the taxable year 1920. Petitioner admits liability for whatever tax may be found to be due by Lake Erie for the year in question.

The Board's findings of fact cover 61 pages of the printed record, and the opinion 57 printed pages. Many of the items dealt with in the findings of fact and much of the discussion in the opinion we think unnecessary, either to a correct understanding of the facts or to a decision of the case. The relevant facts are these: In 1895 Lake Erie leased the properties of Northern Ohio Railway Company in perpetuity and as a part of the same transaction acquired all of that company's common stock. The stock was acquired without cost, but Lake Erie agreed to pay as rental all the net earnings derived from the operation of the leased railroad, and in the event the net earnings were not sufficient therefor, all taxes, insurance, organization expenses to the extent of $1,000 a year, and interest on the Northern Ohio's bonds. Lake

Erie also undertook to maintain the properties in good order and repair. The amount paid by Lake Erie in excess of the net earnings was to be deemed an advance "on the part of the lessee to the lessor."

For the 18-year period from 1895 to 1913, the cost to Lake Erie over and above the net operating revenue was nearly two and a half million dollars, and from 1913 (March 1) to the end of federal control (March 1, 1920) the out-of-pocket cost to Lake Erie was in excess of a million and a quarter. Lake Erie charged these items to operating expenses, and of the amount expended or advanced prior to March 1, 1913, nearly three-quarters of a million were taken as deductions from income in its excise tax returns for the years 1909–1912. The entire sum advanced from 1913 to 1920, inclusive, was deducted in Lake Erie's income tax returns for those years.

Lake Erie never received back any of the advances, nor anything on account of them, but on March 1, 1920, it transferred the stock of the Northern Ohio and the lease to the Akron, Canton & Youngstown Railway Company, and the latter assumed all of the obligations and liabilities of Lake Erie which would thereafter accrue under the lease. On March 1, 1920, Lake Erie's books showed a net balance due from the Northern Ohio Railway Company of $92,661.33. This item represented in part cash outlays, the dates of which do not appear, and in part an amount at which the Director General of Railroads inventoried the materials and supplies on the Northern Ohio lines at the date of the termination of federal control. From the total of these items certain credits were deducted, leaving the item as above stated. In its income tax return for 1920, Lake Erie deducted this amount as a loss for that year. The Commissioner disallowed it, and the Board of Tax Appeals sustained his action. On the appeal to the Board and likewise in this court, petitioner claimed and claims an additional deduction in the amount of at least a million and a half dollars, as a further loss, based on the contention that the expenditures under the lease were capital expenditures and should be treated as the cost for acquiring the lease and the Northern Ohio's stock. The Board likewise disallowed this claim.

The sum of a million and a half, which we have just mentioned as claimed by Lake Erie as deductible in the year 1920, is an arbitrary figure. As a matter of fact, the record shows the total net expenditures of the Lake Erie on account of its lease of the railroad of the Northern Ohio amounted to nearly two and

a half millions for the period prior to March 1, 1913, and a million and a quarter after March 1, 1913, or in all approximately three and three-quarter million dollars. All of this total advanced after federal excise and income taxes were in force was currently deducted by Lake Erie in its tax returns. For some reason, not quite clear, petitioner capitalized in its account with the Northern Ohio Company the $92,000 item to which we have referred, and this item it charged to profit and loss at the time of disposing of its lease and stock interest in the Northern Ohio. The Commissioner, in disallowing the $92,000 item, treated the sums entering into it as rental due by the Lake Erie for its lease of the Northern Ohio. The Board held that these as well as all other sums expended by the Lake Erie in excess of the revenue derived from the operation of the leased property were advances, and said it was clear from the contract and the manner of dealing between the lessor and lessee that it was contemplated by the parties that such advances should be deducted from subsequent earnings derived from the operation of the property; that such earnings were the only source of income from which such advances could be repaid, and in this view the Board held the entire indebtedness of the Northern Ohio to Lake Erie became worthless and uncollectible before 1920, and hence concluded that since the statute requires the deduction to be made in the year in which the worthlessness and uncollectibility are ascertained, the failure to take them in the appropriate year would not justify a later deduction.

We are unable to say from anything which appears in the record, or to which our attention has been called, that the Board was not correct in this holding and conclusion. The evidence shows that the revenues were insufficient from the beginning to meet the expenditures required to be made by Lake Erie under the lease. As far back as 1899, the chairman of the board of Lake Erie stated that the lease was a serious drain upon the earnings of that company and that there was no hope of getting rid of it. This liability continued unabated and undiminished for the quarter of a century during which the property was operated by Lake Erie, and the final disposition of the lease and of the stock was without monetary consideration. The argument before us is that the amounts expended by Lake Erie under the lease were capital expenditures and should be treated as the cost of acquisition of the stock and lease, but no valid grounds upon which this theory can be sustained are suggested to us. The Lake Erie treated this outgo as an operating expense during the whole period of the lease, and regularly deducted the expense in its excise tax and income tax returns for the years 1909 to 1920, inclusive. To treat these expenses now as capital expenditures and permit their deduction in the year 1920 would be, in the first place, a duplication of deductions, and, in the second place, would be to treat as capital expenditures operating losses which have no relation, so far as we can see, to the acquisition of the stock or the lease. We think it clear that the consistent treatment by Lake Erie of these annual outlays was the correct one—deductible, as they were deducted, under section 234 (a) (1) of the Revenue Act of 1918 (40 Stat. 1077). The finding of the Board that they were advances is abundantly supported by the admitted facts, and the finding that when made they were known to be uncollectible and a loss to the company making them, is a finding of fact also supported by the record. We feel this finding should not be disturbed.

There is, however, another question in the case which we must decide. In computing its taxable net income in its return for 1920, the Lake Erie deducted from gross income, as an ordinary and necessary expense of business, the sum of $4,401,355.90. Of the total sum so deducted, the Commissioner disallowed $459,356.19 on the ground that the Lake Erie was reimbursed to that extent by the Director General in the final settlement by him on account of undermaintenance of the properties of the Lake Erie during the period of federal control. The evidence shows that the four million odd thousand dollar expenditure for maintenance in the ten months' period was more than sufficient to make up the undermaintenance during the period of federal control. The Board sustained the Commissioner in his disallowance of the sum received by Lake Erie from the Director General.

The properties of the Lake Erie were under federal control and operation for the period, January 1, 1918, to February 29, 1920. In the succeeding ten months the Lake Erie, as we have seen, expended over four million dollars in the maintenance of its properties and deducted that sum in its tax return as an ordinary and necessary business expense (section 234 (a) (1), Revenue Act of 1918, c. 18, 40 Stat. 1077). The Commissioner disallowed the deduction to the extent of $459,000, on the ground that to this extent petitioner's ostensible maintenance cost was really not its own, but the result of an obligation assumed and discharged by the Director General.

It is not disputed that the Director Gen-

eral failed in his contractual duty to maintain petitioner's property in accordance with the contract during federal control, nor is it seriously disputed that when the settlement was made, the amount paid by the Director General was an allowance for undermaintenance arising out of his failure to discharge his contractual duty. When settlement was made, separate and independent accounting entries were made by the Director General and by petitioner, in which the four hundred fifty-nine thousand-odd dollar item was charged to deferred maintenance account. Nor is it disputed that petitioner's books were on the accrual basis and that the item accrued to petitioner in 1920.

We have, therefore, here a case in which although the Lake Erie spent more than $4,400,000 for maintenance in 1920, this expenditure included the cost of restoring the undermaintenance which occurred during the federal control period. On behalf of the Commissioner it is insisted that of the total sum spent in 1920 for maintenance, $459,356.19 was spent for the account of the Director General and was in fact paid by him, and it is argued from this premise that in such circumstances a railroad may not deduct payments the burden of which is borne by another. The question of the treatment of allowances made by the Director General for undermaintenance has been before the courts and before the Board of Tax Appeals a number of times, but the facts in each of the cases which we have examined are different, and in large measure the decisions, especially the decisions of the courts, turn upon facts not present here, and so we have not much help from any of them. But without regard to what may have been decided before, we think it is too clear for argument that petitioner should not be allowed any deduction for the expense of restoring undermaintenance in the year in which the undermaintenance was restored, when the cost of restoring it is borne by the Director General. If the latter had complied with his contract and maintained the Lake Erie's properties during federal control, as he contracted to do, it is perfectly obvious the four hundred odd thousand dollars of additional expenditure by the railroad in 1920 would have been unnecessary. It would in that case have made its normal expenditure for maintenance, and under the statute would have rightly deducted the whole of that amount, but in the case we are considering, it was required to expend in 1920 four hundred odd thousand dollars more money than was the normal depreciation or maintenance cost for those ten months. The difference between the normal and the actual is represented by the payment made by the Director General. The effect of the payment was compliance by him with his contract. The result was to reimburse the railroad company to the extent of the amount paid by him, and to that extent its payment for maintenance was not an expense of Lake Erie. There is nothing in this conclusion at all different from the decision in Tunnel R. R. v. Commissioner (C. C. A.) 61 F.(2d) 166, for in that case the point was one of fact, namely, whether the allowance made by the Director General was for undermaintenance, and the court found it was not. Nor is it at all different from that of Commissioner v. Norfolk Southern R. Co. (C. C. A.) 63 F.(2d) 304, for in that case the question was whether the amount paid by the Director General for undermaintenance was gross income which the taxpayer was required to report, and the court very properly held it was not.

The only case, to which our attention has been called, in which the conclusion appears to be different from that reached by us is Chicago & N. W. R. Co. v. Commissioner (C. C. A.) 66 F.(2d) 61. There the railroad had received over $6,000,000 from the Director General for undermaintenance and had expended over half of it in excess of normal maintenance, in the year in question. The Court of Appeals appears to have decided that the fact of payment by the Director General would not affect the right to deduction as an ordinary expense. Apparently the court took the view that to hold otherwise would be to classify the money received from the Director General as income, but, with great deference to the views expressed there, we think the question involved in this case need not be complicated by a discussion of whether the effect of disallowance of the deduction would be the equivalent of defining the payment made by the Director General as income; for that question is not pertinent to the facts here, nor are we concerned with the other question, whether it may or may not be designated as a restoration of capital. It is not, we think, deductible in the circumstances we have narrated above. It is perfectly clear that if the Railroad Administration had expended the amount in question and had returned the properties to Lake Erie free of any undermaintenance, there could be no claim to a deduction on that account, for in that case obviously it had not been expended by petitioner. That here it was expended by petitioner is wholly due to the failure of the Railroad Administration, prior to the return of the properties, to expend it, and in recogni-

960

tion of this failure and in discharge of its default, it paid the agreed amount to the railroad in cash. When the railroad got it and expended it, it expended it, to all intents and purposes, for the account of the Director General. It came out of the pocket of the government and not out of the pocket of the railroad, and it was to that extent not an ordinary and necessary expense in carrying on its business, and this, as we think, because the deduction which the applicable section of the income tax law permits, contemplates an expense only out of the funds and property of the person claiming the deduction. On the other hand, if the Lake Erie had shown that the money expended in the ten months' period of 1920 was only normal maintenance, the deduction of the full amount expended would have been permissible, and the payment would not have been taxable as income. In such case it would have been expending only its own funds and the payment from the Director General would have been held by the railroad company in the place and instead of its capital depreciation, and that is just what was decided in the Norfolk Southern Case, supra; but here, as we have said already several times, the railroad as found by the Board, spent not only the amount of money ordinarily required for its maintenance account, but in addition the money which it received from the Director General. As to the former, it was a deductible expense. As to the latter, it was money paid subject to a contract of reimbursement, and, so far as we know, such an outlay has never been considered to be deductible. See Glendinning, McLeish & Co. v. Commissioner (C. C. A.) 61 F.(2d) 950.

The conclusion we have reached, therefore, is that the decisions of the Board of Tax Appeals should be, and are affirmed.

HITZ, Associate Justice, took no part in the decision of these cases.