**STANDARD OIL CO. OF KANSAS v. UNITED STATES.**

No. 43582.

Court of Claims.

Oct. 5, 1942.

WHALEY, Chief Justice, and LITTLE-TON, Judge, dissenting.

J. G. Korner, Jr., of Washington, D. C., and George E. B. Peddy, of Houston, Tex. (David H. Blair and Wright Matthews, both of Washington, D. C., on the brief), for plaintiff.

Joseph H. Sheppard, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dya-, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

The question before us is whether plaintiff practiced, or attempted to practice, fraud in connection with its claim for refund of income taxes paid for the year 1929. The defendant invoked by a proper plea the statute, which is as follows: "Any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance of any claim or of any part of any claim against the United States shall, ipso facto, forfeit the same to the Government; and it shall be the duty of the Court of Claims, in such cases, to find specifically that such fraud was practiced or attempted to be practiced, and thereupon to give judgment that such claim is forfeited to the Government, and that the claimant be forever barred from prosecuting the same. 36 Stat. 1141, 28 U.S.C. § 279, 28 U.S.C.A. § 279. The defendant asserts that fraud was practiced by plaintiff in the presentation to and establishment of its claim before the Bureau of Internal Revenue.

A predecessor corporation, Standard Oil Company (Kansas), had been engaged in the refining of petroleum at Neodesha, Kansas, in which operation it was using certain stills. During the year 1929 its officers and directors, who were in close supervision of the operation, concluded that the use of certain of these stills was uneconomical. No formal action on this question was taken by the Board of Directors and no minute was made in the corporation's minute book. No deduction from income was made in the corporation's federal income tax return for 1929, on account of the obsolescence of these stills, and they remained on the books as assets at least until 1932, though their value was deducted from the corporation's return of its assets for ad valorem taxation by the State and County for 1929.

In March of 1932 Mr. C. B. Wrightsman obtained control of the predecessor corporation and caused to be formed the plaintiff corporation, which took over the assets of the predecessor corporation and, in November, dissolved it. Wrightsman became President of plaintiff, and H. G. Lea, a former federal revenue agent who had been employed by Wrightsman's father for some years, became its Secretary-Treasurer. They held those same offices in the predecessor corporation from March until its dissolution in November.

Shortly after Mr. Wrightsman gained control of the predecessor company in 1932 he employed a firm of accountants to make a detailed audit of the accounts of the company, going over the records for preceding years. The accountant and Lea advised Wrightsman that insufficient charge-offs had been made for obsolescence in prior years, and Lea said that a substantial refund of income taxes paid for those years might be obtained. He said that because of his prior experience as a revenue agent, he could handle the claim without the assistance of outside counsel, and Wrightsman authorized him to proceed with the preparation and prosecution of the claim. Lea prepared and filed an amended return and a claim for refund of $107,789.71 of federal income taxes paid for 1929, setting forth as a ground the obsolescence of batteries of stills Nos. 5, 6, 7, 11, and 12.

An investigation of the claim by agents of the Bureau of Internal Revenue resulted in a recommendation that the claim be allowed in an amount in excess of $75,000, and an appropriate certificate of over-

assessment was prepared by the Income Tax Unit. Under the practice of the Bureau a certificate for such an amount had to be reviewed and approved by the Review Division of the Assistant General Counsel's office before it could be issued. In May 1934 the certificate was, accordingly, referred to the Review Division.

Wrightsman, becoming impatient at the delay in securing the refund, called at the office of the Assistant General Counsel in June and again on September 24. At the latter time he had a conference with several officials there, and some insufficiencies in the evidence supporting the claim were pointed out to him, particularly the lack of minutes of corporate action taken in 1929 showing authorization for the abandonment of the stills in that year. He was asked to furnish this kind of evidence, if available, and also some other items of evidence. He asked that the Bureau write him a letter telling him just what information it desired, which the Bureau did. After the conference on September 24, Wrightsman telephoned to Lea asking whether there were minutes relating to the abandonment of the stills. Lea said that so far as he knew there were not. Wrightsman told him that, unless there were minutes, they would lose the case.

At this point begin the activities upon the basis of which we have concluded that the defendant's plea of fraud has been proved.

Lea was then in Houston with the minute book. If he had not read the relevant minutes before that, he would have read them immediately upon receiving this call from the President of the company telling him that the case would fail unless there were minutes. Yet, to justify one in failing to find that Lea forged the minutes later presented, or at least knew that they were forged, we must believe that Lea did not then, and had not before, read the minutes. We do not find that anything so contrary to all human experience occurred.

When President Wrightsman returned to Houston he discussed the question with Lea and Lea said he thought the Government was not justified in insisting upon evidence consisting of corporate minutes. Lea did not tell Wrightsman that he had found a relevant minute. Wrightsman told Lea to go from Houston to Neodesha, Kansas, and other places in that state and interview the persons who had been officers and employees of the old company in 1929 so that Lea could prepare affidavits for them to sign relating to corporate action in that year. Lea made this journey to Kansas, returned to Houston and had the affidavits prepared and was back in Neodesha to get them executed on November 2. When he started on this first journey he had in the minute book a spurious minute dated January 7, 1930, relating to a survey to determine the obsolescence of stills. He still made no mention of this minute to President Wrightsman. Some months later he told Korner, plaintiff's attorney, that some clerk in the office had called it to his attention. On the witness stand in this hearing he testified, in response to a question of Government's counsel, "I don't remember how it was discovered." Korner, who cross-examined him for plaintiff, and who was later to testify as to what Lea had told him, made no attempt to refresh Lea's recollection as to this vital matter.

Lea took this spurious minute to Neodesha. Metcalf, who had been plant superintendent in 1929 and 1930, refused to execute an affidavit which would have verified the minute, partly because he questioned whether the minute exhibited to him had ever been adopted. Messrs. Hopkins and Warren, who had been officers of the predecessor company in 1929 and 1930, executed affidavits certifying to the minute. Mr. Earle Evans, who had been General Counsel and a director of the old company at the time in question, did not purport, in his affidavit, to recollect the minute, but said he had no reason to doubt its authenticity.

In the meantime Lea caused to be prepared a statement, in the form of a letter dated October 16, 1934, intended to be signed by Wrightsman and addressed to the Government, for the purpose of inducing the Government to allow plaintiff's claim. This statement included the following paragraph: " * * * The company's minute book shows that this matter was under discussion by the officers and directors of this Company on numerous occasions in 1929, during which year it was determined to charge off this obsolete equipment; and it was the intention of the officers and directors of this Corporation, that proper deduction should be made in the tax return of the Company to cover such obsolete equipment. As further evidence of such

determination of the officers and directors of this Corporation, the ad valorem taxes of the State of Kansas for the year 1929 were paid on the basis of this charge-off. * * * "

The statement in Wrightsman's letter, prepared by Lea, relating to plaintiff's corporate minutes for 1929, was in direct response to the Government's statement that evidence of corporate minutes was essential. This statement, so far as Lea was concerned, was completely and deliberately false. No one even claims that it was not. No one claims that there was such a minute, or that anyone had told Lea that there was such a minute. As we shall see, a corporate minute dated May 22, 1929, was later manufactured, but Lea himself sets the time when that minute came to his attention as "some months later. Lea, the Secretary-Treasurer of plaintiff, then, authorized to prepare and prosecute a claim for refund of taxes, deliberately manufactured an important piece of evidence in the form of a statement by plaintiff's President as to the contents of its minute book, for the purpose of securing that refund.

When Wrightsman, on October 17, 1934, delivered the above statement to the government, he also delivered a statement signed by Lea on October 8, 1934, certifying as having been copied from the minute book of the company, the above mentioned resolution dated January 7, 1930, of the Board of Directors of the predecessor company, directing that a plant survey be made of obsolete equipment, including Burton stills, etc., with a view of charging off this equipment for ad valorem and income tax purposes. That statement was as follows:

"The undersigned, H. G. Lea, former Secretary of The Standard Oil Company (Kansas), a dissolved Kansas corporation, does hereby certify that the minute books of the above company show the following resolution was duly adopted at a special meeting of the Board of Directors of the Corporation, duly held on January 7th, 1930:

"*Resolved,* That owing to the perfection of new refining equipment and the present economic conditions, the Treasurer and Superintendent be directed to make a plant survey of all obsolete equipment, including Burton stills, receiving houses, and other items with a view of charging the same off of the records of the Company and deducting the same for both ad valorem and income tax purposes.

"Witness the signature of the undersigned and seal of the Company this 8th day of October, 1934.
     "(Signed)   H. G. Lea,
          "Former Secretary, Custodian
               of Books and Records."

This supposed resolution had never been considered or adopted by the Board of Directors, but had been manufactured for the purpose of being exhibited to the Government's tax lawyers as proof of the pending claim. A page of the minute book largely covered by a printed notice pasted only at the top, left a space beneath the notice unoccupied. The spurious minute was typed into that unoccupied space.

C. J. Wrightsman, the father of plaintiff's President, and Lea came to Washington for a conference with the attorneys in the Bureau on December 5. These attorneys pointed out that the minute of Jan. 7, 1930, did not prove what was needed with reference to company action in 1929. The attorneys asked Lea if he had the minutes which President Wrightsman had certified to in his letter of October 16 stating that "the minute book showed that the matter of abandonment of the stills in question had been under discussion on numerous occasions in 1929." Lea replied that he had searched the records and minute books and had found nothing. This was true. There was no possible reason why Lea should have said it if it was not true. It was damaging to his case, and it was a complete exposure to President Wrightsman's father that he had wilfully and deliberately caused President Wrightsman to make the false statement contained in his letter of October 16.

Immediately following this conference, Lea, apparently not in the presence of C. J. Wrightsman, asked one of the Bureau attorneys how to prove plaintiff's case, and was told that contemporaneous evidence of action in 1929 must be shown or the claim would be denied.

C. J. Wrightsman told his son, President Wrightsman, after this conference that the case was being badly handled by Lea. This was an understatement. He should have told him that Lea was attempting to prove the case by manufacturing evidence, and had already involved him, President Wrightsman, in one such piece of evidence.

Plaintiff then employed counsel, Blair and Korner of Washington, D. C., and Earle W. Evans of Wichita, mentioned above.

On December 7, two days after Lea had told C. J. Wrightsman and the Government attorneys that he had searched the records and minute book and found nothing for 1929, Korner asked him how the resolution of Jan. 7, 1930, had been discovered, and he replied that some clerk in the office had found it and that he himself had never searched the minute book. The purpose of this falsehood is obvious. Lea had, by this time, resolved to manufacture a 1929 minute, to satisfy what the Government attorney, two days before, had told him was essential. He knew that when he produced this minute, newly discovered among the few pages of corporate minutes, Korner would know it was forged unless Lea had put him off guard by pretending that he had been both stupid and careless in his previous preparation of the case. Korner told Lea that a search should be made. This, it will be remembered, was on December 7, 1934, and was more than two months after Lea had been told by President Wrightsman to search the minute book.

If Lea had been honest, even though he had been as stupid and careless as he pretended to be, he would have immediately looked through the few pages of minutes and advised Korner that there was, or was not, a 1929 minute which related to the tax claim. But not until December 21, many days later, did he have any message for Korner on this vital question. Lea then forwarded a certified copy of a forged minute dated May 22, 1929, containing language which, if it had been genuine, would have proved plaintiff's case. During the intervening time, a representative of an accounting firm was engaged in the annual audit of plaintiff's books. Lea asked him to examine the minute books for the prior years and see whether a minute could be found which made any reference to the subject matter of the tax claim for 1929, with particular reference to the abandonment or obsolescence of batteries 5, 6, 7, 11, and 12. The accountant did so and shortly produced the minute of May 22, 1929, referred to above, which was exactly in point and apparently conclusive.

Lea's involving the accountant in this "discovery" was the old and despicable trick of planting evidence where it would be discovered and produced by an innocent person, so that if its criminal character should later be disclosed, suspicion would rest upon the one who, apparently, first came upon the evidence. Plaintiff attempted in this proceeding, without the slightest basis in reason, to throw suspicion upon the accountants.

The minute of May 22, 1929, was, as we have said, a forgery. The forgery had been accomplished by removing and destroying the first sheet of a two-sheet set of minutes of that date, the written signatures of the President and Secretary, Messrs. A. S. Hopkins and A. L. Morrison, authenticating the minutes, being on the second sheet, which was left intact; and by obtaining a sheet of paper of the same apparent age and appearance of the sheet which had been removed, and copying the old minutes from the first page upon that sheet in such a position as to leave room for the insertion of the spurious language about discarding batteries of stills as obsolete. A typewriter whose writing resembled as nearly as possible the writing on the second sheet which had been retained was used to type the new sheet. To further conceal the forgery, a beginning had been made of an attempt to type over the words on the second sheet so as to create the appearance, even to the most careful observer, that both sheets had been written with the same typewriter. The new typing could not be made to fit exactly the old, however, and this attempt had been abandoned after a few lines.

After the conference of December 7 between Lea and Korner, Lea, Korner, and Evans proceeded with securing additional evidence in support of plaintiff's claim. It will be remembered that during this time while Lea was searching in far-away places, among unfriendly people, for outside evidence, and though he had been expressly told by President Wrightsman and by Korner to search the minute book which he said he had not yet searched, he still did not, we are asked to believe, look in the minute book which was right in his hands, but finally told an accountant who happened to be there to look in it. This, of course, is nonsense. Lea's sworn testimony in this case about his search of the minutes was as follows: "I had looked through the minute books, but only casually. I never did read all of the pages, because the minute books consist of a large number of pages, and it was rather dry reading. I had glanced through them on two or three different occasions." As we have seen, the minutes for 1929, other than the obviously irrelevant ones, consisted of 15 pages. Their reading time is not more than 12 minutes.

After the production of the 1929 minute, and its report to Korner, the affidavits which Evans had been attempting to get signed in Neodesha, Kansas, by the former officers of the company were revised to include a certification by them of the newly discovered minute. A photostatic copy of the minute was sent by Lea to Evans to exhibit to the affiants as an assurance of its authenticity. Evans attempted persistently to get Messrs. Hopkins and Warren to execute the revised affidavits. These gentlemen refused to sign the affidavits because they thought that the newly discovered minute was a forgery, and because they now knew that the minute of Jan. 7, 1930, which they had previously been persuaded to authenticate by their oaths, was likewise a forgery. They told Evans this, and he wrote it in detail to plaintiff, also stating in his letter that he thought this was the only reason why they would not execute the affidavits, and that they had given no indication that any reason of hostility or avarice entered into their determinations.

This opinion of the persons who would have known best whether the minutes were genuine or not was brought home to President Wrightsman. He might well have caused an immediate investigation to be made to see where this newly discovered evidence, branded by Hopkins and Warren as forged, had come from. Wrightsman preferred to attribute the opinions of Hopkins and Warren to malice or avarice, and to use the questioned minute as the principal basis of plaintiff's claim.

On February 27, 1935, Korner sent to the General Counsel of the Bureau of Internal Revenue a photostatic copy of the minute of May 22, 1929, a certification by Lea as former secretary and custodian of the corporation's books, of the same minute, and the other affidavits which they had been able to gather. No new affidavits had been obtained from Hopkins or Warren.

Korner arranged for a conference at the Bureau on March 8, 1935. He requested Lea to bring the original minute books to the conference. During the conference, one of the attorneys called attention to the fact that the typing on the two pages of the minute of May 22, 1929, was different, and, after further examination, that the paper on which the first page of those minutes was written had a watermark different from that of all the other sheets in the book.

Lea said that the minute had been discovered by the accountant and, in answer to questions, said he could not understand how this 1929 minute had been overlooked when the minute of January 7, 1930, only seven pages away from it in the book was discovered earlier.

After leaving the Government attorneys, Korner, of course, demanded of Lea an explanation of the discrepancies in the minutes, but Lea offered no explanation. On the next day Lea telephoned Wrightsman in New York that the conference on March 8 with the Bureau had been very satisfactory, but that the Bureau desired two or three pieces of additional evidence, including an affidavit from the accountant supporting the minutes, which affidavit he would obtain in Houston. This whole statement was, of course, false.

Wrightsman was told by Korner on March 11 what had happened at the Bureau. He caused an investigation to be made, including a questioning of Lea by Mr. Peddy, plaintiff's counsel, who had had previous experience as a prosecuting attorney. Lea maintained his innocence, but, so far as appears, offered no explanation of the abundant evidence of his guilt. Mr. Blair, of plaintiff's counsel, asked the Bureau to cause an investigation to be made by the Special Intelligence unit. This was done, and the agent reported that he was unable to fix the responsibility for the alteration of the minutes.

In 1937, after plaintiff learned of the report of the agent of the Special Intelligence unit, it again began to press its claim, not relying, however, on the forged minutes. The claim was finally rejected and this suit followed. Our question is whether plaintiff corruptly attempted to practice fraud in the proof or establishment of its claim for a refund of the taxes here in question.

Lea, a high ranking official of plaintiff and authorized to handle this tax claim for plaintiff, was, as Secretary of the corporation, familiar with corporate minutes, and, as a former federal revenue officer, familiar with tax matters. After this claim had been pending for two years, Lea proceeds to produce, as needed, documentary proof of the claim. The first document is a statement signed by plaintiff's president stating that there are "numerous" 1929 minutes supporting the claim. This statement is deliberately false and its authorship is unquestioned. The next document is a forged

minute. Lea testifies that he does not remember how or by whom it was discovered. An earlier inconsistent statement by Lea, later testified to by counsel for plaintiff, attributing the discovery to "some clerk" is not inquired into by plaintiff in cross-examining Lea. So the only evidence is that Lea produced it, and has no recollection of the circumstances.

The third document is another forged minute, manufactured by destroying a page of genuine minutes after having copied its contents on to a new sheet, and adding the spurious writing in a space carefully left for that purpose. A further attempt to cover the difference in typing, which could have been discovered only by an expert, was made, but because it left discoverable traces, was abandoned after a few lines. This document was produced by Lea, by the device of asking a bystander to look for it, who, of course, readily found it.

The two sets of forged minutes are produced from the place where any person, even without the special qualifications which Lea had as a corporation Secretary and a tax expert, would have looked first. They are not produced until the Government has stated specifically that this kind of evidence is essential, though anyone would have known from the beginning that this kind of evidence would be of great value. The second, and more specific of the documents is not produced until after the first has been rejected by the Government as insufficient, and is produced, on December 21 from the small source in which, Lea said on December 5, he had searched and found nothing. His saying so on December 5 was damaging to his case, exposed as a falsehood President Wrightsman's letter of October 16, and was true, though he stated the contrary to Korner two days later. The document produced on December 21 met with exactness the requirements which were outlined to him on December 5 by Government attorneys.

Now Lea stands silent and explains nothing. Yet we are asked not only to overlook the undenied falsification contained in President Wrightsman's letter of October 16, but to suppose that Lea did not forge, or have guilty knowledge of the forgery of the two sets of spurious minutes which he produced as he thought they were needed. Fraud becomes impossible of proof, and cheap indeed, if nothing but a confession by the one obviously guilty will prove it.

As to the possibility that these forgeries were committed by someone else, we can only say that, giving imagination free rein, as we have no right to do, we can conjure up no other possible explanation of these events. No one else had any motive, any inclination, or any opportunity, to forge these minutes. The defendant has proved its plea of fraud, and plaintiff's claim is forfeited.

WHITAKER, Judge, concurs in the above opinion.

JONES, Judge (concurring).

I concur in the result. Undoubtedly there was attempted fraud. The record makes that fact certain. The difficulty is in identifying the one who is responsible. The finger points strongly to one of the officials of the company. While it may not rise to the dignity of a charge, it certainly does not sink to the level of a mere suspicion; and it is certain that officials of the company presented at least one of these resolutions to the Commissioner of Internal Revenue as unquestioned when they had every reason to know, and at least one of them knew, it was not genuine.

To have the resolutions of January 7, 1930, and May 22, 1929, bob up serenely and so surprisingly, after several years' search for proof had failed to disclose them and just when they were needed, should have been sufficient to cause even an interested party to stop long enough to make a thorough checkup. Any sort of investigation would have disclosed the spurious character of the resolution of May 22.

The issue of fraud which reaches the courthouse is rarely susceptible of direct proof. Usually it must be shown by circumstances. The circumstances of this case are so strong as to preclude any other reasonable conclusion than that there was attempted fraud and that some of the officials of the company knew, or had reason to know, that the resolutions were not authentic. Instead, they submitted as unquestioned, and without any effort to determine their authenticity, these clinching resolutions that had so strangely appeared. It is significant that the resolutions did not even tally. The resolution of January 7, 1930, purported to order a survey to determine a question which the resolution of May 22, 1929, recited had already been settled. Previous inquiry had revealed their nature, but

in their anxiety to further their cause responsible officials of the company chose to present them to the Bureau of Internal Revenue as bona fide.

True, the officials of the company made a thorough investigation later, but that was after the Bureau had challenged the resolutions.

In the circumstances I think the plea in bar should be sustained.

WHALEY, Chief Justice (dissenting, with whom LITTLETON, Judge, concurs).

In my opinion the special answer and plea of fraud should be denied.

I am unable to agree with the majority that fraud has been proved by the clear and convincing evidence universally required in cases of this character and am unwilling to brand an individual as the perpetrator of a fraudulent act on the basis of presumptions, suspicions, and contradictory circumstantial evidence.

Whether fraud is practiced or attempted to be practiced is a question of fact which must be established by clear and convincing evidence and fraud is never to be presumed. It may be circumstantial but the circumstances themselves must be clearly proved and such evidence must be persuasive. Where circumstantial evidence is relied upon to establish a fact the circumstances must be proved, and not themselves presumed. When the evidence leaves a fact in the realm of speculation and conjecture it cannot be rightly found. Chicago, M. & St. P. R. R. v. Coogan, 271 U.S. 472, 477, 46 S.Ct. 564, 70 L.Ed. 1041; United States v. Ross, 92 U.S. 281, 284, 23 L.Ed. 707; Manning v. John Hancock Mut. Life Insurance Co., 100 U.S. 693, 698, 25 L.Ed. 761. A mere preponderance of evidence which at the same time is vague or ambiguous is not sufficient. Lalone v. United States, 164 U.S. 255, 17 S.Ct. 74, 41 L.Ed. 425. The burden of proving fraud is on the party asserting it and the inquiry must therefore be whether defendant has satisfied the court by clear and convincing evidence of the charges made.

For many years prior to 1929 plaintiff had been engaged in the refining of petroleum in which business it had installed and was using certain Burton stills. During 1929 plaintiff's officers and directors gave consideration to further economical use of certain of these stills in its business and reached the conclusion that they were obsolete. In filing its Federal income tax return for 1929, no deduction was claimed for the obsolescence of these stills and they remained on the books as assets at least until 1932. However, in filing its returns for State and County tax purposes for 1929, the value of these stills was deducted in determining the value of its property and its State and County taxes were paid on that basis. An examination of these State and County tax returns shows the identical stills with which we are concerned listed as obsolete. These returns were filed in 1929 long before the present controversy arose and they were filed by the officers of the old company some three years before the present claims for refund were ever considered. That was three years before Lea ever became connected with the company. These facts abundantly substantiate the contention of plaintiff that corporate action and consideration was given to the obsolescence of these stills in 1929 even though not actually recorded in the minute books when the action was taken.

In 1932, after a change in ownership and management of plaintiff had taken place about March 1932, plaintiff filed claims for refund in which among other things a deduction was claimed for the obsolescence of certain stills designated as batteries 5, 6, 7, 11, and 12, the same batteries which were charged off in the State and County tax returns.

It is significant that the claims were recommended for allowance by three different parties, namely, the revenue agent, the valuation engineer, and the Income Tax Unit which reviewed their findings. The revenue agent and valuation engineer not only examined the properties and satisfied themselves of the fact of obsolescence but also interviewed the old officers and found that the requisite acts and events had occurred necessary for the allowance of the deduction under the statute and regulations.

It was after this approval that the attorneys in the General Counsel's Office, to whom the certificate of over-assessment had been forwarded for final review, asked for further substantiating evidence in the form of corporate minutes and in response to that request the questioned minutes were submitted under the circumstances set out in detail in the findings. Here it should be observed that the minutes were not required under the statute for the allowance of the claims; obsolescence is a question

of fact which can be proven by any satisfactory evidence. Admittedly there were suspicious circumstances connected with the presentation of these minutes which all parties recognized from the very outset. When these suspicions were aroused, plaintiff's responsible officers began a most searching inquiry to find who was responsible for the act complained of. In their painstaking investigation they had assisting them Judge Evans, a former president of the American Bar Association and a man of the highest repute and standing, Mr. Peddy, their own general counsel who had had long experience as a Federal and State prosecutor, and their local tax counsel in Washington. In addition, they employed a well-known handwriting expert who made a report after examining the minutes. The man, Lea, now named by the majority as the perpetrator of the act was faced by Mr. Peddy with all of the evidence which had been collected and accused of the act. He not only denied the act at that time but likewise denied it when called as a witness by defendant in this proceeding. Mr. Peddy testified that after a most searching grilling of several hours he was not convinced that Lea had committed the act. I cannot read the testimony of Mr. Peddy and Mr. Wrightsman, plaintiff's president, without being convinced of the thoroughness of their efforts and the sincerity of their conviction that it had not been established to their satisfaction that Lea had changed or forged the minutes.

After it had been unsuccessful in its efforts to solve the problem, plaintiff not only asked the Internal Revenue Bureau to make a thorough investigation through all the forces at its command but also turned over to the Bureau all the evidence which it had collected. Such acts on their parts are inconsistent with the suggestion by the majority that officials of the company, other than Lea, might well have been connected with the act. Guilty parties do not usually ask to be investigated. The Bureau proceeded with investigations by the Special Intelligence Unit and the Federal Bureau of Investigation, and these investigators with all of their experience in matters of this kind and the resources at their command were likewise unable to satisfy themselves who was responsible for the act in question.

After these fruitless efforts by plaintiff and by the Bureau, plaintiff asked the Bureau to reconsider its claim in the light of the entire record, and with all of these facts before it a committee of attorneys for the General Counsel of the Bureau recommended the allowance of the claim. It is true that the claim was never allowed but in none of the letters from the Bureau denying the claim is there any suggestion that the denial is on account of these so-called fraudulent minutes.

Substantially the same persons were interviewed in these investigations who testified in this proceeding and substantially the same documentary evidence was considered in these investigations as has been presented in this proceeding. I have examined this evidence most carefully and I am unwilling to say that the party has been identified who changed the minutes and thus place the stamp of a criminal on him. The circumstances are not connected, and must be largely assumed, and the suspicions become vague and contradictory when the evidence as a whole is considered. The preponderance of evidence is not enough. The rule governing this case is one between the greater weight of the evidence in civil cases and beyond a reasonable doubt in criminal cases. The mind must be satisfied the fraud was committed or attempted to be committed. An element of substantial doubt permeates the evidence.

One of the many factors which makes the solution difficult is the open hostility of the old officers, who were in charge of the affairs when the minutes would have been adopted and recorded, toward the present officers of plaintiff. We find them signing affidavits in support of the minutes, withdrawing those affidavits, and also suggesting that they would aid the plaintiff for a money consideration. We also have employees of the old company who were discharged by plaintiff when the change in corporate entity took place, some of whom were not kindly disposed towards plaintiff. In addition we have the accountants who had made an examination of the books of plaintiff and on whom it would be a reflection to have overlooked the minutes in question. Their testimony is far from convincing and smacks of inconsistency. One of them was discharged by an accounting agency after this investigation.

To say, as does the majority, that the evidence is clear and convincing that Lea changed the minutes, it is necessary to consider only the favorable parts of the

record and overlook that which is unfavorable to such a position. The most that can be said is that certain evidence indicates the possibility that the individual named by the majority could well have committed the act, whereas much doubt is cast on its sufficiency by other evidence. Under such circumstances, I am unwilling to say either that this individual did the act or that it was done by someone in a position of responsibility with plaintiff. Too many possibilities exist that some other persons not in a position of authority or responsibility may well have done the act and the corporation innocently presented the minutes without knowing they were genuine. To apply the harsh rule of forfeiture of plaintiff's claim, which responsible agencies of the Bureau have recommended for allowance, when the evidence is so wide the mark of being clear and convincing, transcends my idea of justice and results in a gross inequity to which I am unwilling to subscribe.