### CABIN CREEK CONSOL. COAL CO. v. UNITED STATES.

No. 5084.

Circuit Court of Appeals, Fourth Circuit.

Sept. 6, 1943.

Theodore B. Benson, of Washington, D. C. (Clarence J. Benson, of Charleston, W. Va., on the brief), for appellant.

George H. Zeutzius, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and A. F. Prescott, Sp. Assts. to Atty. Gen., Lemuel R. Via, U. S. Atty., of Huntington, W. Va., and Charles M. Love, Jr., Asst. U. S. Atty., of Charleston, W. Va., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Southern District of West Virginia dismissing taxpayer's claim for the refund of $316,-218.41, assessed against, and paid by, it. This amount represents additional corporate income taxes, excess and war profits taxes, and interest, for the calendar years 1917–1920, inclusive.

The findings of fact in the court below are not reported. They cover more than 30 pages. However, it is not necessary that we consider all of them, since the taxpayer on appeal has abandoned certain of its original claims. For purposes of convenience, we therefore accept the following concise and accurate statement, which appears in the government's brief, of those facts which seem relevant to our consideration of the case:

"The taxpayer, Cabin Creek Consolidated Coal Company was incorporated under the laws of West Virginia, January 29, 1907. * * *

"In February 1907, the assets of 15 coal mining companies having leases covering 20,000 acres, more or less, of coal lands containing 19 fully developed operating mines, with plant and equipment, were acquired by taxpayer for $1,200,000 of its capital stock, $500,000 of its bonds, and $770,-000 in notes and bonds, or a total agreed consideration of $2,470,000. There was no paid in surplus.

"The 19 mines had reached the full stage of their development or planned output by the date of taxpayer's acquisition thereof in 1907. Only three new mines were opened on the properties, one in 1909, one in 1911 and one in 1919. Two of the 19 original mines were abandoned in 1915, the Keystone and Caledonia. No new properties or mines were acquired during the period commencing February 1907 through December 31, 1920.

"In 1916, plaintiff issued and sold preferred stock of a par value of $300,000 for $250,000 in cash. Prior to December 31, 1916, it acquired $176,200 worth of its own outstanding stock and carried it as treasury stock. On October 1, 1917, it retired $110,-000 worth of its outstanding stock.

"The court found that taxpayer's invested capital, exclusive of earned surplus, if any, for 1917, 1918, 1919 and 1920 was $1,-246,300; $1,340,000; $1,295,800 and $1,295,-800, respectively, and was represented by outstanding capital stock in those amounts. As to earned surplus, it found that, in view of the offsetting adjustments in favor of the United States, allowed by the findings, taxpayer's earned surplus as determined by the Commissioner for 1917–1920 has been either completely or substantially eliminated. It further found that in no event could taxpayer's 'invested capital be adjusted so as to exceed the total amount of invested capital determined by the Commissioner for each of the years 1917 to 1920, inclusive, * * *.'

"Taxpayer filed, annually, returns of net income for 1909, 1910, 1911 and 1912, under Section 38 of the Corporation Excise Tax law, 36 Stat. 112, showing net taxable incomes for each of those years, except possibly 1912. Returns were also filed for 1913, 1914, 1915 and 1916, showing net taxable incomes for 1914 and 1915 and net losses for 1913 and 1916. If taxpayer's incomes for 1909 to 1916, inclusive, were adjusted in accordance with the claims now advanced by it, taxes in larger amounts than were paid for those years would have been due for 1909, 1910, 1911, 1914 and 1915, and net taxable incomes, rather than net losses, would have resulted for 1912, 1913 and probably for 1916.

"Taxpayer timely filed its corporate returns for the calendar years 1917, 1918, 1919 and 1920, reporting tax liabilities of $324,-

.570.24, $291,053.13, $13,527.26 and $320,110.-37, respectively, which were paid and are not in dispute, except for $2,867.18 forming part of the liability shown on the 1920 return.

"As the result of an audit by the Commissioner of Internal Revenue of taxpayer's returns filed for 1917 to 1921, inclusive, the assessment of additional income, excess and war profits taxes was proposed by letters dated in June 1923 and May 1925 for the calendar years 1917 to 1920, inclusive, in the aggregate sum of $789,022.28. In an endeavor to reduce the proposed deficiencies, taxpayer employed the American Appraisal Company which made an investigation and analysis of, and a report on, taxpayer's books, records and affairs for the period commencing February 1, 1907 through 1920. Taxpayer also employed various qualified persons to represent it before the Treasury Department, including one Jackson who was the principal representative of the American Appraisal Company. The Appraisal Company's report consisted of three volumes, Nos. 1, 2 and 3, dated November 22, 1923. Volumes 1 and 2 were supplemented by a report dated July 29, 1926, and were submitted by taxpayer to the Commissioner. Volumes 1 and 2, and the supplemental report, covered the period from taxpayer's incorporation in 1907 through 1916 but contained no reference to or suggestion of the existence of Volume 3 for the immediately succeeding period, 1917-1920, involved in this suit. The Bureau of Internal Revenue had no knowledge of the existence of Volume 3, or its contents, at any time prior to the institution of this suit. As the result of conferences, and representations made by and on behalf of taxpayer, the Commissioner and his subordinates were induced to and did rely thereon, and accept, follow and adopt the statements, accounts, values, property accounts, depreciation deductions, capital and non-capital expenditures, reserves, etc., in the amounts and on the basis set forth in Volumes 1 and 2, as modified by the supplemental report of July 29, 1926. The adoption of taxpayer's statements and representations based on Volumes 1 and 2, as supplemented, resulted in a reduction to $247,746.71 of the previously proposed deficiency of $789,022.28 for 1917 to 1920, inclusive. All material factors used in arriving at the $247,746.71 determination were mutually agreed upon between taxpayer's representatives and the Treasury Department. Thereafter taxpayer, in writing, requested the Commissioner to issue the 60-day deficiency letter on the basis of which the assessments now sought to be recovered were made and paid. The deficiency letter was in fact issued April 30, 1927, and stated that the value of plant and equipment, as shown by the books, had been reduced 'to the value shown by the appraisal and accepted by the Commissioner for depreciation, and invested capital purposes.'

"Volume 3, knowledge of which to the Commissioner was found intentionally, wrongfully and fraudulently to have been suppressed by taxpayer, carried forward through 1917-1920, inclusive, the treatment of plaintiff's property, income and affairs in a manner consistent with that followed and adopted in Volumes 1 and 2. Had Volume 3 been submitted to the Commissioner, taxes greatly in excess of $247,746.71 would have resulted.

"The evidence and pleadings disclose that taxpayer's present position with respect to the major items involved in this suit is contrary to the treatment requested by, granted to and procured by it in the deficiency determination of April 30, 1927. The court found that under all of the circumstances, and particularly by reason of taxpayer's suppression of Volume 3, its acts, conduct and representations involved in submitting and urging only that part of the Appraisal Company's report which was favorable to it, the Commissioner and his subordinates were completely misled into taking action which operated to the prejudice of the United States, for had Volume 3 been submitted further additional taxes would have been shown to be due, assessable and then collectible for 1917 through 1920.

"The court also found that taxpayer received tax advantages for 1916 and prior years to which it would not be entitled if the treatment it now seeks were granted to it, that is, it would have underpaid its taxes for those years and would have received a double benefit for sums alleged to have been erroneously expensed if its present claims, first asserted in 1931, now were granted; that when taxpayer first advanced its claims herein in 1931, the assessment or collection of additional taxes for the years 1909 to 1916 was barred by limitations; that the assessment of any additional taxes for 1917 to 1920, inclusive, beyond those asserted in the deficiency letter of April 30, 1927, likewise were barred in 1931.

"On April 17, 1931, taxpayer filed separate claims for the refund of $64,609.73

for 1917; $184,498.03 for 1918; $5,474.77 for 1919 and $61,636.18 for 1920. These claims were prepared by Walter Ennis, accountant, assisted by Hal M. Scott, engineer, and examined and approved by taxpayer's present counsel, none of whom testified herein. In each claim, it was asserted that the Commissioner understated taxpayer's invested capital and overstated its net income in divers amounts. A number of the grounds asserted in the claims were abandoned in this suit. Each of the claims was rejected by letters (from the Commissioner of Internal Revenue) dated February 27, 1936."

The case was tried in the court below on the pleadings, stipulations of facts embodied in 2 pre-trial orders, testimony of eight witnesses, and 130 documentary exhibits. After making 37 exhaustive findings of fact, the court then set out the following conclusions of law:

1. Taxpayer has failed to carry the burden of establishing that it has overpaid its taxes for the years 1917, 1918, 1919 and 1920.

2. In equity and good conscience, taxpayer ought not and will not be heard to assert that it is entitled to a refund for any of the years in suit, especially in view of its acts, conduct, representations and omissions set forth in the foregoing findings. In any event, taxpayer even if otherwise entitled thereto, is estopped to have restored to invested capital any amounts which it alleges to have expensed during the years 1909 through 1916, inclusive, because it had the benefit thereof as deductions from income in computing its federal tax liabilities for each of the years commencing in 1909, and the Commissioner and the United States at the time taxpayer filed its claims for refund in April, 1931, were barred by limitations from assessing or collecting additional taxes which would be due for those years if proper adjustments were made, as well as for the years 1917 to 1920, inclusive.

3. With respect to all items concerning which taxpayer would receive a double benefit by having its claims allowed, it in equity and good conscience, is not entitled thereto.

4. The taxes assessed against and paid by taxpayer involved herein, were lawfully assessed and collected.

The taxpayer now raises seven specific points on this appeal wherein the lower court allegedly committed error. We believe that none of these contentions contains merit and we shall discuss them separately.

The court below held that the taxpayer should not, in equity and good conscience, be permitted to assert its present claims for refund. Taxpayer, however, contends that it has the statutory right, by virtue of section 1106 of the Revenue Act of 1926, 26 U.S.C.A. Int.Rev.Acts, page 318, to maintain this action and that it is not now estopped from correcting any errors in the deficiency notice.

The applicable section, § 1106, needs little or no explanation and it is true that a closing agreement was not issued pursuant to its terms. Nor are we unmindful of the fact that this is the exclusive method by which a tax case may be compromised. Botany Worsted Mills v. United States, 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379; Brast v. Winding Gulf Colliery Co., 4 Cir., 1938, 94 F.2d 179. Yet it seems quite obvious why the taxpayer did not seek a closing agreement in the light of its surreptitious suppression of Volume 3 of the American Appraisal Company's report.

The existence of this vital and essential source of relevant data was not only concealed from the government in connection with the refund claims filed in 1931, but knowledge by the government of its existence was not even acquired until after the refund claims had been rejected and after this action had been instituted.

The effect of this wrongful and fraudulent action by the taxpayer was to induce the Commissioner of Internal Revenue to take steps prejudicial to the government by erroneously reducing the proposed deficiency of $789,022.28 to $247.746.71. Accordingly, in view of the clandestine conduct of the taxpayer, we deem it immaterial that no statutory closing agreement was executed; so that, even if the taxpayer had overpaid its taxes, its fraud would preclude a recovery at this time. See Standard Oil Co. of Kansas v. United States, C.C., 1942, 47 F.Supp. 120; 28 U.S. C.A. § 279.

Taxpayer's second point is that it makes no claim to a double deduction as found by the trial court and that it is not estopped from now asserting a correct determination of the true amount of taxes actually due from it. Neither argument nor authority has been advanced by taxpayer in support of this contention. We also find

ourselves unable to breathe life into the mere barren statement, (cf. Article 64(3) of Treasury Regulation 41), for the reason that the record contains ample evidence to support the position taken by the court below that the taxpayer would, in both fact and law, receive a double benefit if the present claims for refund were allowed.

Taxpayer's third point deals with invested capital. This term is thus defined in section 207 of the Revenue Act of 1917, 40 Stat. 306: "In the case of a corporation * * * : (1) Actual cash paid in, (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation * * *, at the time of such payment * * * and (3) paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year."

■ The definition of invested capital in section 326 of the Revenue Act of 1918, 40 Stat. 1092, is substantially similar to that in the 1917 Act. It is thus obvious that invested capital does not include borrowed capital; for this latter term is defined in section 325(a) of the Revenue Act of 1918 as "money or other property borrowed, represented by bonds, notes, open accounts, or otherwise."

■ In the light of these statutory provisions, we have no quarrel with taxpayer's claim that its original investment never changes unless withdrawals therefrom are made. We are unable, however, to accept taxpayer's statement that: "The investment by the stockholders in the corporation, not to be reduced by operating deficits or losses is the $2,470,000.00, less $855,000.00 borrowed money, and plus the $49,756.33 contributed from timber sale and the $250,000.-00 added investment in 1916 or $1,914,756.-33."

This contention is supported by neither the findings of fact nor the evidence. The record expressly reveals that the total cost to the taxpayer for the acquisition of the 15 coal mining companies was $2,470,000. Taxpayer paid for these by the issuance of $1,200,000 of its capital stock for $1,200,000 of the assets transferred to it, while the balance of the assets in the amount of $1,-270,000 were paid for by taxpayer's notes and bonds in the sum of $1,270,000.

Thus, the $1,270,000 item, consisting of notes and bonds, was correctly treated by the court below as borrowed money, since the amount of $1,270,000 of the assets was *not* transferred to taxpayer in payment for stock. Taxpayer's bare statement that the $855,000 was borrowed money lacks support in the record and is plainly erroneous. Hence, there was no paid in surplus and consequently, neither the Commissioner of Internal Revenue nor the court below reduced the original investment of the taxpayer.

■ Taxpayer contended that there should be added to the capital investment the earned surplus and undivided profits of prior years. The court below made a specific finding of fact that, in view of certain offsetting adjustments which had been allowed in favor of the government, the taxpayer's earned surplus, as determined by the Commissioner of Internal Revenue, had been either completely or substantially eliminated. Our examination of the record leads us to the conclusion that there is substantial evidence to support this finding of the court on the issue of invested capital.

■ In a pre-trial order, taxpayer conceded that it was estopped from claiming restoration to invested capital of all items expensed on its books for any years since March 1, 1913, in which a tax was due. Since the taxpayer would now stand to benefit by its change of position, the doctrine of estoppel would also appear to be applicable to all years commencing with 1909, whether or not there was any taxable income. Cf. New York, C. & St. L. R. Co. v. Helvering, 1934, 63 App.D.C. 247, 71 F.2d 956, dealing with the 1909 Corporation Excise Tax Act.

Taxpayer's fourth contention is that in order to determine earned surplus and undivided surplus for each year through 1916, expenditures for equipment and development, having a useful life of more than one year but expensed by the taxpayer, should now be restored to capital, unless the taxpayer was benefitted by the expensing and the deducting of such items in the determination of its taxable income for the years after February 28, 1913.

A complete answer to this claim is the specific unchallenged finding of fact number 20 by the court below, which is directly contrary to taxpayer's contention:

"The amount of $434,472.90, sought as an addition to invested capital, is alleged to have been spent for development. This amount is a mere estimate which was made by Messrs. Ennis, Scott and Benson for the purpose of filing the claims for refund.

It is not identifiable from plaintiff's books and does not appear actually to have been spent, but even assuming such amount, or any part thereof, was spent, plaintiff's counsel admitted during the trial that plaintiff had the benefit thereof as deductions from income in its federal tax returns for the years 1909 through 1916. Plaintiff also conceded that it is estopped to claim restoration to invested capital of items expended for any years since March 1, 1913, if a tax were due for such years. Assuming it was shown that the amount of $434,472.90, or any part thereof, actually was spent, there is no evidence showing the amount of depletion sustained and deductible with respect thereto up to and including December 31, 1916, nor what part of the alleged development remained in existence and in use on December 31, 1916. Neither is there any evidence showing the amount of gross or net receipts from sales of coal taken from entries, airways and break-thrus with respect to said alleged development. If it be assumed that any amounts were spent for alleged development, it may well be that the receipts from the sale of coal taken from entries, airways and break-thrus in the alleged development of mines equalled or exceeded the amounts spent therefor. The initial investment of plaintiff corporation in the developed coal and development for the 19 mines, fully developed when acquired in 1907, was $800,-000."

We see no reason for setting aside this finding at this time.

Taxpayer's fifth point is that since it acquired commingled assets, the separate costs of which cannot be determined, the full cost must be returned through depreciation and depletion at composite or per unit rates or at percentage of gross sales, and that no deductions are to be taken on the sale, scrapping, abandonment, or loss of any of the assets so acquired. Several bulletins issued by the Commissioner of Internal Revenue are cited in accord with this principle; but taxpayer's position otherwise consists of a mere statement of a cold and isolated legal proposition. No attempt is made to apply the doctrine to the facts of the instant case and since the adverse findings of the lower court in this respect are not contested by taxpayer, this contention requires no further discussion.

Taxpayer's sixth claim is that the Commissioner of Internal Revenue erroneously and arbitrarily increased the amount of the reserve for depreciation on both plant and equipment, and set up a separate reserve for depletion without at the same time making proper restorations to capital of the cost of additions to plant and equipment, development of mines, and without restoring to capital losses erroneously deducted on the sale, abandonment or loss of assets. Unfortunately, taxpayer's claim here is based on unwarranted and inaccurate statements of fact. For example, taxpayer asserts that the mine capacity was increased subsequent to 1907. This is in direct conflict with the express finding of fact number 4 by the lower court that 19 of the mines had reached their planned output and full stage of development by the date of their acquisition in 1907. As to the three new mines, taxpayer failed to show any actual cost of development.

Moreover, here again without contesting the findings of the lower court, the taxpayer now seeks a relitigation and trial de novo with respect to the original action of the Commissioner of Internal Revenue. This position is untenable since the findings on this point are amply supported by the stipulated facts, the uncontradicted testimony of witness Malone, and the admissions against interest on the part of the taxpayer in the pre-trial order.

Taxpayer's seventh and final point is that the total amount of royalties payable under its leases for each of the years 1917, 1918, 1919, and 1920 should be allowable as deductions from income, regardless of a possible recovery thereof in future years.

Finding of fact number 25 by the court below expressly states: "It has been shown that the determination of the Commissioner with respect to the amount of royalty deduction allowed for each of the years in suit was erroneous. Plaintiff, in its brief filed herein, has abandoned all claim of overpayment of taxes for 1919, with the statement that there was little tax paid for 1919 and for that reason it has not submitted proof as to the deductions from income."

Taxpayer has not challenged the correctness of this finding. We accept it on its face value, since it is supported by substantial evidence in the record. Moreover, in connection with each of taxpayer's claims for additional deductions on account of royalties, the record clearly reveals that these amounts, for each of the years in question, are more than offset by adjustments in favor of the government.

For example, stipulation 9 of the first pre-trial conference and finding of fact number 29. by the court below conclusively establish that the entire amount of $17,-534.04 claimed by taxpayer as an allowable royalty deduction for the year 1917, would be entirely absorbed by a credit item on be-, half of the government in the sum of $26,-152.09 for that same year. And this was concededly a proper offsetting income adjustment. This was also true for the years 1918 and 1920. Accordingly, the doctrine of Burnet v. Hutchinson Coal Co., 4 Cir., 1933, 64 F.2d 275 is clearly inapplicable to the facts of the instant case.

For the reasons assigned, we think that no single contention of taxpayer contains substantial merit. The judgment below, dismissing taxpayer's petition, is therefore affirmed.

Affirmed.