KAMEN SOAP PRODUCTS COMPANY, Inc.,

v.

The UNITED STATES.

No. 49543.

United States Court of Claims.

Oct. 5, 1954.

See also, 110 F.Supp. 430, 124 Ct.Cl. 519.

Robert Martin, Washington, D. C., for plaintiff. Marx Leva and Fowler, Leva, Hawes & Symington, Washington, D. C., were on the brief.

Bruce G. Sundlun and Mary K. Fagan, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

On May 28, 1947, the plaintiff entered into a contract with the Quartermaster Corps of the United States Army to furnish a specified amount of powdered laundry soap. It alleges that the defendant breached the contract in failing to supply shipping instructions, thus preventing it from accelerating delivery.

The defendant filed a special plea in fraud. At the trial the evidence was limited to the issues raised by the special plea and that is the sole issue before the court at this time.

The invitation to bid was issued on May 12, 1947. The bidding was on the furnishing of 2,190,000 pounds of laundry soap. The invitation stated that sealed bids in triplicate would be received until 12 noon of May 19, 1947.

It also stipulated that delivery of the soap should be in monthly installments of 440,000 pounds each on the last day of August, September, October, and November 1947 and the remaining 430,000 pounds by December 31, 1947. The invitation itself contained this provision:

"Contractor is requested to accelerate and increase the deliveries to any extent provided the total of such accelerated and increased deliveries does not exceed the total quantity stipulated herein."

The invitation also notified prospective bidders that the vendor would be required to comply with instructions with respect to quantities, consignees, destinations and delivery dates as set forth in Vendor's Shipping Documents (VSD's) to be supplied by the Government at a later date. It was apparent to bidders that at least 1,750,000 pounds of tallow would be necessary for the manufacture of the soap included in the invitation, tallow being the principal ingredient in the manufacture of such soap. Actually 1,850,000 pounds were used.

The ceiling price on tallow had been removed by act of Congress some months before the contract in question was executed. Almost immediately the price of tallow rose to $21\frac{3}{4}$ cents per pound, gradually increased until March 1947 when it was $26\frac{3}{4}$ cents per pound, then gradually decreased until in May it was $12\frac{3}{4}$ cents per pound. Several days prior to May 19, 1947, plaintiff decided to submit a bid of $0.139 per pound for the soap, but this figure was changed on the morning of May 19, 1947, just before the bid was submitted, at the instruction of Mr. Kamen who directed that a price of $0.119 per pound be inserted in the bid. He took this action after learning from a tallow broker that the price of tallow had dropped to $12\frac{3}{4}$ cents per pound, and that the trend in the tallow market was downward.

The bid form stated that the period for acceptance of the bid would be 60 days if no shorter period was specified by the bidder. The bid form contained a blank space to be filled in by the bidder to show

the number of days required by him for acceptance of the bid. This space was left blank in plaintiff's bid, which allowed the full period of 60 days for its acceptance. There was another blank in the bid form under the heading of "Delivery or shipment desired." In this blank plaintiff's bid read "as scheduled or better." Mr. Kamen, plaintiff's president and treasurer, personally delivered plaintiff's sealed bid in triplicate to the New York Quartermaster Purchasing Office (NYPO) on the morning of May 19, 1947, and remained there throughout the bid opening.

Plaintiff contends that it also submitted with its bid a covering letter of May 19, 1947, limiting the time for the Government's acceptance to ten days from the date the bids were opened. The question of whether or not such a letter was submitted bears upon defendant's special plea in fraud. A copy of the letter which plaintiff claims was submitted is set out in finding 14.

On May 19, 1947, all the sealed bids, including those received by mail and those personally delivered by the bidder, were opened. The bid officer then read aloud for the information of all present the pertinent data on the bid, including the time allowed for the acceptance of the bid and other delivery conditions. Where a bid was accompanied by a letter the contents of the letter also were read by the bid officer. The bid of the John T. Stanley Company was accompanied by a letter, and this letter was read.

According to the recollection of all the witnesses present at the bid opening, including Mr. Kamen, no covering or qualifying letter from plaintiff was read in connection with plaintiff's bid. Mr. Kamen, who remained throughout the proceedings, did not mention that a letter had been submitted with plaintiff's bid, nor did he make any statement or protest in connection with the contract provision as to the time within which plaintiff's bid might be accepted by the defendant. Plaintiff's bid was the lowest of the seven received. Mr. MacIntosh,

the defendant's commodity section representative, took with him the second and third copies of each bid. These were used in preparing and checking certain documents which were required before an award could be made. Among these documents was an abstract of all bids which was made by taking from the bids and entering on the abstract sheet pertinent information including the name and address of each bidder, the quantity bid upon, the delivery schedule, if different from that specified in the specifications, and the time allowed by each bidder for the acceptance of his bid.

After the abstract was prepared the information thereon was verified by the bid officer, who compared it with the original bid in his possession. The particular information set forth in the covering letter submitted with the bid of the John T. Stanley Company was abstracted along with other information. No reference to a covering letter claimed to have been submitted by plaintiff with its bid was made in either the abstract of the bid or the approval of the award.

It was necessary to obtain the approval of the Quartermaster General in Washington before the award could be approved. This was done and on May 28, nine days after the opening of the bids, Mr. MacIntosh notified Mr. Kamen by telephone that the plaintiff's bid for the entire quantity of soap was being accepted, and that a letter of award would follow.

The next day plaintiff received the letter of award dated May 28, 1947. This letter stated that the shipment would be made in accordance with the schedule specified in the invitation and that the destination of such shipments would be shown on Vendor's Shipping Documents to follow.

The price of tallow on May 31, 1947, was 12¾ cents per pound. On June 13, 1947, it declined to 11¾ cents per pound, where it remained through the rest of June, July, and until August 29, 1947, when it increased to 12¾ cents per pound. It gradually increased until on

September 30, 1947, it had reached 19¾ cents per pound.

On May 16, 1947, plaintiff submitted to the Veterans' Administration a bid to furnish additional soap and was awarded the contract which required more than 400,000 pounds of tallow. Plaintiff thus had commitments on the two contracts which would have required a total of approximately 2,400,000 pounds of tallow. Its storage capacity in Barberton, Ohio, where the plant was located, was 500,000 pounds of tallow. Its inventory was only a little more than 300,000 pounds. Plaintiff ordered some additional shipments in May, June, and September, as set out in findings 26 and 29. It did not order any tallow during July and August 1947. Two cars which plaintiff had purchased at 18½ cents per pound were resold by it in November at 22 cents per pound. One car purchased at 19¾ cents per pound was resold in November at 25¾ cents, and two cars purchased at 19½ cents were resold by plaintiff in November at 22½ and 23½ cents per pound.

On July 12, 1948, plaintiff submitted a claim to the General Accounting Office in which it asserted that during the period from June 2 to September 26, 1947, it had consumed 1,555,285 pounds of tallow in producing soap for the Veterans' Administration, for commercial customers and for State and Federal agencies other than the Quartermaster Corps.

In the pending action, which was filed March 13, 1950, plaintiff asserts that the Government failed in June and July 1947, to furnish shipping documents, to provide information needed for marking shipping containers and to supply inspection service, and that as a result plaintiff was compelled to defer delivery of the tallow ordered in May and June. Plaintiff also contends that the Government's breach of the contract forced plaintiff to seek new business and to sell soap produced from the tallow ordered for the contract at a loss.

However, in its claim of July 12, 1948, which is referred to in a previous paragraph, plaintiff did not assert that the defendant's breach of contract had com-pelled plaintiff to postpone delivery of the tallow purchased for the contract.

The contract involved in this suit provided that when the soap was ready for shipment plaintiff should notify the headquarters of the Quartermaster Inspection Service in New York City. On July 8, 1947, the defendant's area supervisor addressed a letter to plaintiff at Barberton stating that he planned to visit the plant on July 11, 1947, to discuss arrangements for inspecting, packing, marking and shipping the soap to be supplied under the contract. He assigned the inspection work to Peter Carr, an inspector under his jurisdiction. Mr. Carr promptly advised plaintiff of his assignment and gave the address at which he could be located, but on July 23, 1947, not having heard from plaintiff, he telephoned plaintiff's plant engineer to inquire when production of the soap for the contract would begin. He was told it would not be ready for a few days, whereupon Mr. Carr advised that he was starting on an inspection trip and left information listing the places at which he could be reached during the month. When he arrived at the Barberton plant on August 1, 1947, plaintiff's manager stated that he would soon be ready to produce soap. On August 4, 1947, plaintiff started production of soap for the contract and promptly notified Mr. Goodman, the area supervisor, that inspection services were needed. Mr. Goodman went to plaintiff's plant in response to this message and on August 7, 1947, he notified Mr. Carr that his services were required at the Barberton plant. Mr. Carr arrived there on August 8, 1947, at which time a batch of soap of approximately 60,000 pounds had been manufactured and was ready for inspection.

It was necessary to have Vendor's Shipping Documents before plaintiff could make shipment. On several occasions during June and July representatives of plaintiff orally requested Mr. MacIntosh to supply shipping documents, but were unable to obtain them. Mr. MacIntosh informed plaintiff that on account of the lack of storage facilities

shipping documents could not be issued in advance of the dates provided in the shipping schedule. The first shipping documents were issued by the NYPO on August 8, and received at the plant on August 11, 1947; the first shipment was made the same day. Between August 5 and 9, 1947, there was some delay due to the lack of sufficient tallow at the plant. After August 28, 1947, there was no delay for lack of shipping documents. During the period August 8 to November 19, 1947, the Government issued and delivered to plaintiff VSD's covering the entire quantity of soap to be shipped under the contract. Plaintiff shipped a total of about 400,000 pounds of soap in August, September, and October 1947. No shipments were made in November and December 1947.

The sharp increase in the price of tallow during the period August 29 to September 30, 1947, was due largely to the fact that on September 11, 1947, the Government, through the Department of Agriculture, announced export allocations of fats and oils for the fourth quarter of the year, which exceeded by 276,000,000 pounds the allocation for the same quarter of the previous year. Word of the proposed increase in exports may have reached the trade in advance of the official announcement, since a sharp upward movement started about two weeks before the announcement was made.

On September 30, 1947, Mr. Kamen wrote the contracting officer a letter which is set out in finding 41, in which he requested "your immediate consideration to delay delivery or increase the price of soap under this contract as it is working a tremendous hardship on our company." Plaintiff called attention to the fact that the Government had increased the allocation of fats and oils for export and that the price of fats and oils used in the manufacture of soap had increased to practically double the price available at the time the contract was executed. The Government was asked to modify the contract in order to relieve the hardship. The letter en route to the contracting officer passed through the hands of Mr. MacIntosh who initialed it and added the words "merits consideration."

Mr. Kamen conferred with the contracting officer early in October and again urged an increase in the contract price upon the ground that the Government's export program for fats and oils was responsible for the sharp rise in tallow prices. On October 13, 1947, the contracting officer suggested that the plaintiff submit a specific presentation of its claim, showing the actual loss to be incurred by plaintiff, accompanied by a brief statement as to why plaintiff had not covered itself with the necessary basic materials after the contract had been awarded. Plaintiff replied under date of October 31, 1947, again contending that the Government's increased export allocation of fats and oils had caused the domestic increase in the price of tallow, and gave as the reason for not having covered itself with basic raw materials that it had been the practice and policy in the industry to purchase tallow for 30 to 60 days ahead. The letter emphasized the fact that the contract made in May stated that the delivery was not to start until August, and stated that plaintiff was not able to procure its August requirements of fats and oils until July. Mr. Kamen also stated in a later letter that at the time the bid was accepted, it was impossible for either side to foresee the conditions that had developed. These letters are set out in findings 43 and 44.

On November 21, 1947, the contracting officer advised plaintiff that its contentions did not constitute excusable causes of delays within the meaning of the contract; that his office had no authority to grant an increase in the contract price on the basis set out in plaintiff's letter, and that plaintiff was obligated to make deliveries in accordance with the delivery schedule at the price set forth in the contract.

During all these communications no contention had been made by plaintiff that it had undertaken to accelerate de-

livery under the contract but was prevented from doing so by the Government's failure to supply the necessary shipping documents. Nor did plaintiff in any of these letters claim that its bid had been qualified by a covering letter indicating that it intended to accelerate its deliveries under the contract.

Another letter was written on December 8, 1947, requesting that plaintiff be allowed to delay the delivery of soap under the contract until the price of fats and oils receded. It repeated the assertions from the previous letters. In addition plaintiff for the first time contended that it had intended to accelerate deliveries under the contract and would have completed such deliveries prior to September 12, 1947, had it not been for the failure of the Government to supply the necessary shipping documents and inspection service. Pertinent parts of this letter are set out in finding 46. This letter was intended as an appeal from the decision of November 21, 1947. Several more letters passed between plaintiff and Col. Herbert R. Watson, who was appointed as the successor contracting officer.

On April 29, 1948, while plaintiff's appeal was pending before the War Department Board of Contract Appeals, the contracting officer wrote plaintiff stating that its right to deliver the remainder of the soap called for under the contract had been terminated under Article 5 entitled "Delays—Damages"; that the Government would purchase the undelivered quantity in accordance with the terms of the contract, and that any excess cost would be charged against plaintiff. At that time plaintiff had delivered a total of 490,589 pounds of soap, leaving 1,699,402 pounds undelivered.

On May 7, 1948, a conference was held in the office of the contracting officer, at which time it was agreed by both parties that plaintiff would continue deliveries of the undelivered portion of the contract, commencing on May 24, 1948, and would deliver at the rate of not less than 600,000 pounds of soap per month until the full quantity was delivered. It was also stipulated that plaintiff would withdraw its appeal without prejudice to its right to file a claim for damages with the General Accounting Office.

By letter dated July 13, 1948, plaintiff filed with the contracting officer a claim which was addressed to the General Accounting Office. Plaintiff claimed reimbursement of losses amounting to $261,610 which it alleged resulted from: (1) losses sustained in the disposal of tallow procured for use on the contract and sold elsewhere because of the Government's failure to accept delivery in accordance with the accelerated delivery clause of the contract, and (2) losses occasioned by the Government's demand for delivery of the soap at a later date, and by its acts which caused an increase in the price of tallow. It asserted that the losses were due to the Government's failure to furnish Vendor's Shipping Documents promptly.

The claim was transmitted by the contracting officer to the office of the Chief of Finance, Department of the Army, with the report and recommendation of the contracting officer. The report stated that in the opinion of the contracting officer the Government had breached the contract in refusing to accept accelerated deliveries, and that the contractor was entitled to provable damages therefor. It stated, however, that the memorandum of endorsement by Mr. MacIntosh indicated that he had no recollection of having had any conversations with the plaintiff regarding delivery schedules, but that Mr. MacIntosh had admitted that after the award was made the representatives of the company made telephonic and personal visits to his office requesting shipping instructions. Mr. MacIntosh's memorandum is set out in finding 51. In it he stated that no. written requests were received from the plaintiff for VSD's, but that he had been telephoned regarding the issuance of VSD's and had advised that due to the lack of storage facilities, authority to comply with the acceleration clause was denied. The memorandum stated that the contractor was advised that it must

comply with the shipping schedule as outlined in the contract.

In late September the office of the Chief of Finance of the Department of the Army wrote plaintiff that its claim had been forwarded to the General Accounting Office for direct settlement. On November 17, 1948, the General Accounting Office forwarded to the Chief of Finance of the Department of the Army a letter which has been characterized by officers of the General Accounting Office as a development letter. The General Accounting Office did not make an independent investigation of the matter, but issued the letter on the basis of the information set forth in plaintiff's claim and the data transmitted by the Army. The letter is set out in finding 52. It stated that on the basis of the information submitted the contractor was entitled to whatever increased cost it was required to incur in the manufacture and delivery of the soap called for in the contract, not exceeding the reasonable value of the soap determined upon the basis of the prices prevailing for similar soap at the time deliveries were made. Later the General Accounting Office advised plaintiff that the contracting officer had been requested by it to furnish a determination as to the amount which might be allowed on plaintiff's claim pending completion of a final audit.

From November 1946 until the end of December 1949 the NYPO was under the command of Gen. L. M. Grice. The New York office was a multiple procurement office which had from 10 to 30 contracting officers under the command of General Grice. Matters involving a major question of policy were usually presented to General Grice, but it was not until December 1948 after the General Accounting Office had issued the development letter that General Grice learned of plaintiff's claim and the fact that it had been submitted to the General Accounting Office with the recommendation of Colonel Watson, the contracting officer. General Grice sent for the files, talked with some of the personnel in the office and quickly concluded that Colonel Watson of his office had made a serious mistake in recommending the approval of plaintiff's claim.

General Grice then convened a series of meetings in his office. One of these meetings on December 10, 1948, was attended by General Grice and other personnel in his office as well as by Mr. Kamen and his attorneys. A number of questions were asked Mr. Kamen regarding his conversation with Mr. MacIntosh prior to the submission of plaintiff's bid; also concerning plaintiff's inventory of tallow; its acquisition and sale of tallow; plaintiff's other contracts and the amount of tallow required for them; plaintiff's efforts to obtain Vendor's Shipping Documents, and other pertinent subjects.

General Grice ordered Colonel Watson, who was en route to a permanent station in Japan, to return. He also recalled Colonel Kuhn who had served as contracting officer on plaintiff's contract from May to December 1947, and asked him to make a written statement regarding his knowledge of plaintiff's claim. An attorney in the legal section of the New York office who had no prior connection with the claim was detailed by General Grice to assist in the investigation, and auditors were assigned to make an investigation and report on the accounting data submitted by the plaintiff. Statements were taken from the inspector, information was obtained regarding the availability of storage space at the time plaintiff's contract was entered into, and an investigation was made as to the availability of export packing containers.

On December 24, 1948, Colonel Watson, the successor contracting officer, submitted his supplemental report and recommendation on plaintiff's claim. This report was a complete reversal and repudiation of his original report of September 2, 1948. The report stated that no request for Vendor's Shipping Documents had been made of Colonel Kuhn, the contracting officer during the period involved; that Colonel Kuhn had not delegated his authority to any person,

and that neither Mr. MacIntosh nor any other employee had the authority to reject any request or make any administrative decision even if such request had been made. The report further stated that the contractor had not complained, prior to submitting its claim on December 8, 1947, that the Government had failed to supply shipping documents.

The report of the contracting officer, together with the statement and recommendation of General Grice with the endorsement of the Quartermaster General, was forwarded to the General Accounting Office on January 13, 1949. The Army also submitted other data which had been procured in the course of the investigation. The Army sent several auditors to plaintiff's office in New York and the investigation extended over a period of more than six months. Mr. Kamen made plaintiff's files fully available to them and when the audit was completed, there was submitted a determination made by the contracting officer who succeeded Colonel Watson to the effect that the plaintiff was not entitled to recover anything on its claim.

On July 12, 1949, the General Accounting Office issued a settlement certificate denying plaintiff's claim. The reasons for the denial are set out in finding 58. Among other reasons was a finding that plaintiff's letters of September 30, October 31 and November 7, 1947, demonstrated that plaintiff did not have sufficient tallow on hand to manufacture the soap covered by the contract and understood that it was not bound to complete deliveries prior to the dates set out in the contract; that the tallow which plaintiff had on hand was used for filling other orders, including a contract with the Veterans' Administration; that the plaintiff sold substantial quantities of tallow at a profit during the months of August, September, and October 1947, although plaintiff had contended that it could not obtain sufficient tallow to complete performance of the contract. Several other reasons were given. Plaintiff requested reconsideration. An attorney in the General Accounting Office, Stephen P. Haycock, was charged with the duty of reviewing the evidence and preparing a decision.

As a part of the effort to secure a reversal of the General Accounting Office's decision of July 12, 1949, Mr. Kamen filed an affidavit which covered many phases of the controversy, including a detailed statement to the effect that he intended, and that he so advised Mr. MacIntosh at and after the date plaintiff received the invitation to bid, to begin the manufacture and shipment of the soap immediately after the contract was awarded and to complete all deliveries by the end of August 1947. Mr. MacIntosh submitted an affidavit dated September 28, 1949, denying many of the assertions in Mr. Kamen's affidavit and stating that while plaintiff had requested VSD's prior to August 1947, such requests appeared to be routine and were made without any indication that the contractor intended to accelerate deliveries of soap.

During a conference with one of plaintiff's attorneys on September 15, 1949, Mr. Haycock advised the attorney that the evidence available in the General Accounting Office did not indicate that plaintiff intended to accelerate delivery of soap under the contract and stated that the evidence prior to plaintiff's letter of December 8, 1947, did not show any intention to accelerate. Mr. Haycock also advised plaintiff's attorney that if plaintiff had any documents which indicated its intention to accelerate delivery such documents should be produced without delay.

On the following Tuesday, September 22, 1949, Mr. Kamen telephoned Mr. Haycock stating that his attorney had acquainted him with Mr. Haycock's comments at the conference. In the same conversation Mr. Kamen related that as a result of the call from plaintiff's attorney he had searched the files and found certain interoffice memoranda and teletype messages which passed between plaintiff's New York office and its Barberton plant. He read one of the memoranda and inquired whether that was

the type of evidence Haycock had in mind and was told that it was.

On September 22, 1949, Mr. Kamen wrote his attorneys and enclosed photostatic copies of several teletype messages to and from plaintiff's Barberton plant and also four photostatic copies of interoffice memoranda between the New York office and the Barberton plant. This letter is set out in finding 59. These documents were sent by plaintiff's attorneys to the General Accounting Office for the purpose of overcoming the objections raised to plaintiff's claim. By letter of October 1, 1949, plaintiff's attorneys transmitted to Mr. Haycock three additional interoffice memoranda between plaintiff's New York office and its Barberton plant. These were dated June 12, July 11, and July 16, 1947. The three memoranda submitted on October 1, 1949, were on tissue and each was marked "copy."

Defendant's plea of fraud is directed to the seven interoffice memoranda above referred to, and these are set out in full in findings 81 to 87, inclusive.

On November 3, 1949, the Comptroller General issued his decision on the plaintiff's request for reconsideration. The decision, which is in evidence, summarized plaintiff's claim in connection with the evidence which was made available to the General Accounting Office and stated that such evidence did not support either plaintiff's contention that it intended to make deliveries of soap at the rate of 800,000 pounds a month beginning the first of June 1947 and to complete the contract before the middle of August 1947, or its assertion that it had the ability to accelerate as represented, but on the other hand indicated that plaintiff was delinquent in deliveries after VSD's were furnished.

A few days later Mr. Kamen conferred with Mr. Haycock of the General Accounting Office and challenged a statement in the Comptroller General's decision to the effect that plaintiff was delinquent in deliveries of soap even after shipping documents had been furnished, and asserted that he could establish the inaccuracy of the statement.

The same afternoon Mr. Kamen telephoned from the New York office to Mrs. Vesta McCanna, an employee in the Barberton office, and instructed her to make a thorough search for the bills of lading. Prior to that date he had requested the office at Barberton to send all papers pertaining to the Quartermaster contract to the New York office. Mrs. McCanna advised him that all such papers had been sent to New York in response to the previous request, but he insisted that she make a thorough search anyway. She did so and found a carton of documents, including yellow copies of the bills of lading, in a dead storage room on the third floor of the plant. Attached to these copies was also a copy of plaintiff's bid and a carbon copy of the letter of May 19, 1947. Mr. Kamen instructed that the entire carton be sent to him in New York. He then telephoned Mr. Haycock in Washington stating that he had found the bills of lading. He also read the letter to Mr. Haycock, who suggested that these documents be mailed to the General Accounting Office.

On November 26, 1949, plaintiff's attorneys requested the Comptroller General to reconsider his decision primarily on the basis of the letter of May 19, 1947. This letter is set out in finding 64.

Plaintiff's attorney submitted two copies of the letter of May 19, 1947; one was a ribbon copy marked "copy" and the other was a photostat.

Plaintiff's claim that the letter of May 19, 1947, established the fact that it had sought to accelerate the deliveries of soap under the contract was also brought to the attention of officials of the Department of the Army.

Plaintiff's attorneys on November 28, 1949, wrote to the Assistant Secretary of War asserting that the NYPO had distorted the facts and had lost the letter of May 19, 1947.

The General Accounting Office requested the Quartermaster General to make a thorough search for the original of the

letter dated May 19, 1947, and to make a full report as to this and several other contentions. This request was referred to the NYPO, and Harry D. Shargel, an attorney in the legal section of the NYPO, was directed to make the search. He examined all the files in the office pertinent to the contract and interviewed all the NYPO personnel whom he believed to have had occasion or opportunity to see the letter. His search failed to produce any information regarding the letter. Until the General Accounting Office letter of December 1, 1949, was handed to him, Mr. Shargel had never received any information regarding the existence of the letter which plaintiff claims was submitted with its bid. The Department of the Army submitted its report to the General Accounting Office, detailing the search covering several matters, but definitely stating that no trace of the letter had been found. A number of affidavits were attached to the report.

On February 13, 1950, the Comptroller General denied plaintiff's request for reconsideration and stated that after an exhaustive search no trace could be found of such a letter. On March 13, 1950, plaintiff filed its petition in this suit to recover $1,800,000 damages claimed to be due as the result of breaches of the contract by the defendant.

In connection with the preparation of the Government's defense, the Federal Bureau of Investigation was requested to make a complete investigation and audit including especially all facts relating to the letter of May 19, 1947, and the seven interoffice memoranda, copies of which had been submitted by plaintiff to the General Accounting Office on September 23 and October 1, 1949. The investigation was conducted primarily by Special Agents George Simpson and Thomas Hurley, at times assisted by other agents. Considerable time was spent in plaintiff's office. Mr. Kamen and his employees cooperated and allowed free access to the files and records.

Among the records made available to them was a file marked "A May 19, 1947, cover Letter." After photographing the letter, the agents returned the file to Mr. Kamen. It was subsequently established that all four copies of the letter in the file were from the same typing run. The agents later asked plaintiff to supply the carbon copy of the original letter which plaintiff claimed had been written and submitted to the New York Quartermaster office on May 19, 1947. Mr. Kamen searched his records and produced the folder which the agents had returned to him three days before. At the time the folder contained only the photostat of the letter. The agents stated that they wanted the carbon typed in 1947 rather than a photostatic copy thereof. When Mr. Kamen was unable to find the carbon in the file, they asked him to sign a statement on the reverse side of the photostat to the effect that the original of the carbon copy, from which the photostat was made, was personally delivered by him to the Army Quartermaster. At the beginning of the statement the words "I believe" were added at Mr. Kamen's request before he would sign it. The agents then requested Mr. Kamen to produce the seven interoffice memoranda which plaintiff claimed had been prepared in 1947. The investigators insisted they wanted the actual memoranda.

Later, on July 10, 1950, while the agents were in Mr. Kamen's office, he delivered to them a carbon copy of the letter of May 19, 1947. The agents told him that they desired to deal only with original evidence and pointed out that they had previously seen the ribbon copy, two carbon copies and a photostatic copy of the letter in the folder. The agents asked him if he was certain that the letter tendered by him was the true carbon copy prepared in 1947. He replied that he thought it was the true carbon copy but that he could not be positive. At the agents' request he promised to notify them later if he found the document which he decided was the true carbon prepared in 1947. On the same date, July 10, 1950, Mr. Kamen also delivered to Agents Simpson and Hurley seven interoffice memoranda with the statement that the documents were being supplied in accordance with the request the agents

had previously made on June 26, 1950. These documents consisted of a carbon copy and six ribbon copies of letters on interoffice memorandum forms.

The agents learned that the procedure in plaintiff's office in the transmission of interoffice memoranda was to send the original memorandum written on the printed form to the office receiving the message and to retain a carbon copy of the document in the office which sent the message. While this procedure was followed in general, it was found that on some occasions the carbon copy was sent to the receiving office and the original retained in the office from which the message was sent. Hence, when the seven interoffice memoranda were furnished, the agents requested Mr. Kamen to obtain and deliver to them the other half of each of said seven interoffice memoranda. These were later furnished.

On August 29, 1950, upon receiving a message that Mr. Kamen desired to see him on an important matter, Mr. Simpson called at plaintiff's office and was told by Mr. Kamen that while he was reviewing a legal file at his home, he had found an additional copy of the May 19, 1947, letter, and that he had concluded that this document was the true carbon copy of the letter, because it was attached to another letter that had been mailed to him by his attorney. Part of the sheet upon which the letter appeared had been torn off at the top and bottom. Mr. Kamen explained that the letter was in a torn condition when he received it from the Barberton office. He stated that to the best of his knowledge this letter was the duplicate carbon copy of the original which was submitted. He explained that this letter was filed away by the Barberton office staff after the completion of the contract in August 1948 and kept there until their office girl, Miss [sic] McCanna, was requested to send to the New York office copies of VSD's and bills of lading used in connection with this contract. He also stated that in tearing this letter from the other letters attached to it, it was torn at the upper left hand

corner because of the many staples holding it together.

On November 8, 1950, Mr. Kamen delivered to the agents the ribbon copy and one of the carbon copies of the letter of May 19, 1947, which they had observed in the folder on June 22, 1950. These had been requested by the agents to make certain that they had obtained all known copies of the letter in Mr. Kamen's possession. The originals and carbon copies of the memoranda and the five copies of the cover letter were the only copies of such documents that were found by the agents during the investigation.

All these documents were submitted to the laboratory of the FBI in Washington, D.C. The agents also took typing samples made on all the typewriters in plaintiff's New York office. Before the samples were taken it was ascertained that there had been no sale or exchange of typewriters in the New York office and no interchange of typewriters between the New York and Barberton offices during the period between May 1, 1947, and June 1950. They also made a random selection of letters and memoranda which had been prepared during the period between May 1947 and June 1950, and samples of blank forms of interoffice memoranda found in plaintiff's supply cabinet.

After reports of the investigation and laboratory analysis had been made, the Department of Justice decided that a plea of fraud should be filed on behalf of defendant in this case, but before it was filed plaintiff's then attorney of record was informed that the Government had determined that the letter of May 19, 1947, and the seven interoffice memoranda had not been prepared on the dates claimed by plaintiff and that the defendant intended to file a plea of fraud.

Thereafter plaintiff's attorney advised Government counsel that Mr. Kamen had been notified of defendant's intention to to file a plea of fraud and that as a result, Mr. Kamen had delivered to his attorney a carbon copy of the letter of May 19, 1947, which Mr. Kamen believed was the

true or original copy of that document. Government counsel requested that the letter be submitted to the FBI laboratory, but plaintiff's attorney stated that he preferred to have the document examined by an expert selected by him. However, on August 2, 1951, plaintiff's attorney submitted to Government counsel the copy of the letter of May 19, 1947, which had been delivered to him by Mr. Kamen and identified by him, as above stated, as the true or original copy of the May 19, 1947, letter. The carbon copy of the letter was sent to the FBI laboratory where an examination disclosed that it was a carbon copy of the ribbon copy which the FBI agents observed in plaintiff's files on June 22, 1950; that it was a part of the same typing run as the two carbons they saw in the file on the same date.

The uncontradicted evidence shows that the three carbon copies of the cover letter obtained by Agents Simpson and Hurley were part of the same typing run and were made from the ribbon copy they had observed in the folder on June 22, 1950; that the carbon copies were made on Flywate onionskin, which was neither purchased nor used by plaintiff prior to August 1949; that the ribbon copy from which these carbon copies were made was prepared on a typewriter in plaintiff's New York office in 1949, and that the photostatic copy of the letter delivered to Agents Simpson and Hurley, as well as the photostatic copy submitted to the General Accounting Office on November 26, 1949, are both photostats of defendant's exhibit 1, which Mr. Kamen and his attorney presented to Government counsel on August 2, 1951.

These copies are all on file as exhibits in this case. Defendant's exhibit 61 is the torn copy of the letter of May 19, 1947. Mrs. McCanna did not identify this exhibit as the copy of the letter which she had found attached to plaintiff's bid, but in his letter of September 1, 1950, Mr. Kamen stated that defendant's exhibit 61 appeared to be the copy of the letter found by Mrs. McCanna. The letter is torn at the top and bottom to the extent that only a fragment of the watermark remains. As explained in finding 77 a laboratory examination, including an enlarged photograph, shows that the typewriter key which typed the letter "t" in the word "Quartermaster" on the first page of the letter, and the letter "t" on the second page in the word "not" was damaged. A comparison with other interoffice memoranda shows that the damaged "t" first appeared in such memoranda on September 7, 1949. This indicates that defendant's exhibit 61 was prepared after the middle of the year 1949. However, the expert who made this comparison was able, in connection with his examination of other questioned documents, to point out numerous characteristics in the typing as a basis for his conclusions, and we find that it has not been established by a clear and satisfactory preponderance of the evidence as to when this particular copy of the letter was prepared.

The evidence of record shows clearly and convincingly that plaintiff did not submit the letter of May 19, 1947, to the NYPO with its bid. With the exception of Colonel Watson, who did not testify, the defendant produced as witnesses the officers and employees of the NYPO who, in the normal course of their duties, should have seen the letter if it existed. None of these had ever seen or heard of such a letter prior to March 1949, although more than one thorough search was made. Although Miss Weissman of the plaintiff company made an affidavit on November 17, 1949, reciting that the questioned letter had been dictated to her by Mr. Kamen, signed by him and submitted with the bid, she signed a written statement at the request of Special Agent Simpson on August 20, 1951, to the effect that her affidavit was based on the fact that her initials were typed on the lower left hand corner of a copy of a letter that was shown to her at the time and that she could not recall whether she had typed the letter. She testified on the witness stand that she could not recall whether the letter had been dictated by Mr. Kamen and typed by her.

Title 28 United States Code § 2514 reads as follows:

"A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

"In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture."

■ It will be noted that this statute goes further than merely banning fraudulent claims. It provides for a forfeiture of the claim if any fraud is practiced or attempted to be practiced in proving, establishing or allowing a claim. This is one of the conditions on which the Government gives its consent to be sued and waives its otherwise sovereign immunity.

The undisputed evidence shows that the originals of the seven interoffice memoranda were prepared on a type of interoffice memorandum form which was first purchased by the plaintiff in May 1949; that the printed interoffice memorandum forms used in plaintiff's New York office and the Barberton plant in 1947 were of a different printing from the printing on the questioned memoranda; that the carbon copies of the furnished memoranda are on Flywate onionskin, a type of paper which was not purchased or used by plaintiff prior to 1949. Two of the memoranda were purportedly sent from Barberton, Ohio, to the plaintiff's New York office in 1947, but the undisputed evidence shows that these memoranda were written on forms which were not used in the Barberton office in 1947, but were in fact written on forms which were purchased and used in the New York office in 1949; that the carbon copies of the two memoranda were prepared on a type of paper which was not purchased or used by plaintiff prior to 1949, and that the two memoranda were prepared on a typewriter in plaintiff's New York office.

When faced with this evidence plaintiff did not deny that the copies furnished by it and in evidence as defendant's exhibits 47 to 60, inclusive, were prepared in 1949. In his testimony Mr. Kamen denied that he had represented that the questioned documents were the true documents prepared in 1947, but said that if he made such representations he meant only that the contents of the questioned memoranda were the same as those of the true documents.

■ We are face to face with the question of whether fraud was practiced in the presentation of this claim. Ordinarily fraud can only be established from circumstances.[1] These, however, must be clear and convincing. About the only way a just conclusion can be reached is by placing the questioned documents and statements alongside well-known and established facts. Every event in the universe is linked to every other event. One cause produces an effect, and that effect in turn becomes a cause; thus all events from the beginning of time are woven into one complete pattern.

It is difficult, therefore, to make up a story that is not a part of this one continuous design. It is like a patch on a suit of clothes—it may be made out of the same cloth, may look the same in the middle, but will show around the edges, because it is not a part of the original garment. Likewise a made-up story will not fit into the scheme of events, because it is not a part of it. It will not, therefore, stand close examination. One made-up story calls for another and the last fabrication will not tally with the next fact.

Although plaintiff's claim had been pending for almost two years, and although numerous conferences were held, letters submitted, and supporting documents filed, there is nothing to indicate that plaintiff had ever referred to any of the questioned documents until after the General Accounting Office had advised plaintiff's attorney on September 15, 1948, that none of the documents which

---

1. New York Market Gardners' Ass'n v. United States, 43 Ct.Cl. 114; Standard Oil Company of Kansas v. United States, 47 F.Supp. 120, 98 Ct.Cl. 201.

plaintiff had previously submitted demonstrated plaintiff's intention to accelerate deliveries under the contract. Within five days after this advice was received, Mr. Kamen telephoned the General Accounting Office that he had located certain interoffice memoranda and teletype messages that had passed between the New York office and the Barberton plant in 1947. In his letter of September 22, 1949, he made the unqualified statement that he was transmitting photostatic copies of four of the memoranda of 1947 that he had located in his files. It is not the custom of businessmen of experience to make photostats of copies of documents, especially when the original documents themselves are available. That such was not plaintiff's practice is, we think, demonstrated by the fact that the second batch of interoffice memoranda transmitted to the General Accounting Office on September 23, 1949, consisted of memoranda typed on tissue and plainly marked "Copy." The generally recognized purpose of a photostat is to provide an exact reproduction of an important or valuable document in lieu of submitting the document itself.

After it had been established beyond any question that both the originals and the carbon copies of the seven interoffice memoranda, which Mr. Kamen supplied to the Federal Bureau of Investigation agents, were prepared in 1949, plaintiff offered no evidence in explanation of its inability to produce any one of these 14 documents which it says were prepared in 1947.

It is true that original documents are sometimes lost, but if we undertake to accept plaintiff's claim that copies were made in 1949 of documents that were prepared and sent in 1947, then we must also find that when the need of such proof was made known by the General Accounting Office, Mr. Kamen was able to locate in his files seven original and seven carbon copies of memoranda that were exchanged between the New York office and the plant in 1947; that having located these documents in September 1949, plaintiff made both ribbon and car-

bon copies of them on forms similar to but not the same as forms used in 1947; that contrary to the custom normally followed by businessmen, plaintiff then made photostats, not of the original documents, but of the 1949 copies, and sent such photostats to the General Accounting Office; that after the copies were made plaintiff retained seven of them in its New York office and sent seven to Barberton two years after the original documents were purportedly written, and that in 1950 plaintiff had Barberton return the copies sent to it in 1949 after the FBI agents had requested the opposite numbers of the memoranda obtained in plaintiff's New York office.

Under the circumstances which we have described, we find it altogether strange that if plaintiff located and had copies made of the true documents, it was unable to produce a witness who prepared or saw any of the 1947 documents, or who made any of the copies which the evidence shows without dispute to have been prepared in 1949.

In our findings we have pointed out a number of other circumstances from which we must conclude that the questioned documents are inconsistent with and contrary to the established facts. We specifically mention only one more here. The memorandum of May 13, 1947, was purportedly sent by Mr. Kamen from his New York office to the Barberton plant regarding the bid on the contract involved in this suit. However, the unchallenged evidence shows that on the morning of May 13, 1947, Mr. Kamen was in the Barberton plant and at that time received a teletype message from the New York office stating that the bid on the Quartermaster contract had been received and that the soap would have to comply with certain specifications. Of course, Mr. Kamen could not write from his New York office to the Barberton plant at the same time he was in Barberton, and the only explanation that plaintiff makes is that the teletype message could have been received by Mr. Kamen in Barberton during the morning of May 13 and that he could have flown to New

York and written the questioned memorandum to Barberton on the same date. However, it seems highly improbable to us that after Mr. Kamen had received the teletype regarding the bid opening on this contract, he would forego the opportunity to discuss the matter at firsthand with the manager while in Barberton and would return the same day to write a letter on subject matter which he could have discussed in more detail and with greater convenience while he was in the plant itself. Thus in weaving a story the skein becomes tangled with established facts and the strands do not fit.

■ It is not a pleasant thing to make a finding of fraud, but the priceless ingredient in the alchemy of American business operations is the integrity of the maker of a product, or of the one who furnishes the materials and services. Only by faith in such integrity can the vast economic system of our country be maintained. We reluctantly find that fraud was practiced in the presentation of this claim. The defendant's special plea of fraud is sustained, and the claim is forfeited.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.